**[Cite as *In re L.H.*, 2022-Ohio-2755.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                  |   |                          |
|------------------|---|--------------------------|
| IN RE: L.H.      | : | APPEAL NO. C-220161      |
|                  |   | TRIAL NO. F18-1642X      |
|                  | : |                          |
|                  | : |                          |
|                  | : | *O P I N I O N.*         |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 10, 2022

*Christopher Kapsal,* for Appellant Mother,

*Mary Salyer*, Attorney for the Guardian Ad Litem for L.H.,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Nicholas C. Varney*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**Bock, Judge.**

**{¶1}** Appellant mother J.H. appeals the trial court's judgment terminating her parental rights to her child, L.H. We affirm the trial court's judgment.[1]

## Relevant Facts and Procedural History

**{¶2}** In November 2018, the Hamilton County Department of Job and Family Services ("JFS") filed a complaint for emergency interim custody of L.H. and his older sibling, M.W., after JFS received reports of hazardous conditions in the home and that L.H.'s father, R.D., was abusing J.H. JFS alleged that, when J.H. was at the hospital in preterm labor with L.H, R.D. choked J.H. in the hospital room, spat on her, told her that he hoped that the baby would die, and threw her call light into the bathroom so that she could not reach it, all while she screamed for help.

**{¶3}** J.H. tested positive for marijuana when L.H. was born in October 2018. Nevertheless, L.H. was discharged to J.H. from the hospital. She and L.H. lived with A.H., L.H.'s maternal grandmother.

### Interim Custody Hearing

**{¶4}** A JFS caseworker testified that J.H. had filed a temporary restraining order ("TPO") against R.D. based on the assault at the hospital, but she dropped it the day before the interim custody hearing. J.H. testified that she had dropped the TPO because she and R.D. "had a sit-down and talked about the whole incident" before the restraining-order hearing.

**{¶5}** J.H. had informed both JFS and a YWCA assessor that R.D. had a history of committing domestic violence against her. J.H. had described an incident

---

[1] L.H.'s grandmother and aunt had petitioned for custody, but they did not appeal the trial court's judgment.

where R.D. attacked her when she was about five months pregnant with L.H. She locked herself in the restroom with M.W. and tried to call the police. R.D. "ripped the door off the hinges," destroyed J.H.'s phone, and punched her in the face while she was holding M.W.

{¶6}	JFS's initial safety plan required L.H. to live with J.H. and A.H., under A.H.'s supervision. J.H. was required to engage in domestic-violence counseling. In October 2018, before the interim custody hearing, JFS discovered that J.H. was not following the safety plan, and J.H. told JFS that she would not follow the safety plan.

{¶7}	The JFS caseworker testified that R.D. had several charges for domestic violence that had been dismissed for want of prosecution, which JFS believed showed a "pattern that [R.D.] has in his past and he has the ability to potentially manipulate whoever his partner is into dropping charges against him."

{¶8}	J.H. testified that she had not been in contact with R.D. since L.H. had been born. But a JFS assessment supervisor testified that J.H. recently had told her that the dependency case was "putting a wedge between her and [R.D.'s] relationship." J.H. had told JFS that she would be with R.D. if it were not for the dependency case. J.H. later told JFS that she wanted to give R.D. another chance because "people make mistakes."

{¶9}	Although JFS had been given emergency custody of L.H. on the night before the hearing, J.H. refused to tell JFS where L.H. was or to meet JFS to turn physical custody over to JFS. The JFS intake caseworker further testified that L.H. was at risk of imminent harm if custody were remanded to J.H.

3

**{¶10}** The juvenile court granted interim custody of L.H. to JFS. The court adjudicated L.H. dependent in January 2019 and committed him to JFS's temporary custody in March 2019.

Despite services, J.H. remained in a relationship with R.D.

**{¶11}** J.H.'s case plans required her to engage in domestic-violence counseling, individual counseling, and parenting education. An April 2019 semiannual report ("SAR") reflected that J.H. had completed "Women Helping Women," a domestic-violence assessment through the YWCA, and was provided with supportive services under her case plan. J.H. reported that she was no longer in a relationship with R.D. and did not live with him. But a September 2019 SAR report reflected that J.H. had stated that she was in a relationship with R.D. and intended to continue that relationship.

**{¶12}** In October 2019, JFS modified its temporary-custody motion to a motion for permanent custody of L.H., alleging that J.H.: (1) failed to attend L.H.'s medical appointments despite being notified, (2) was pregnant again by R.D., (3) had not been to counseling between May 2019 and August 2019, and (4) police continued to respond to J.H.'s home for "family trouble." The motion further alleged that J.H. and R.D. continued their relationship, which was marred by domestic violence.

**{¶13}** In December 2019, J.H. gave birth to another child. R.D. was the alleged father. The parents had to visit the children separately due to domestic-violence issues.

**{¶14}** In July 2020, the magistrate determined that probable cause existed that J.H. continued a relationship with R.D. despite her engagement in domestic-violence services. R.D. had listed J.H.'s address as his own, and there had been "multiple police runs to [J.H.'s] home as recently as May and June [2020] involving

4

[R.D.]." Given that "the principle [sic] issue in this case * * * involved [J.H.'s] domestically violent relationship with [R.D.]," the evidence that J.H. had continued to maintain a relationship and live with R.D. "gives the Court probable cause to believe that she has not benefited from the domestic violence services that she received and that she lacks the protective capacity to provide care for an infant."

{¶15} An October 2020 entry stated that R.D. had been staying the night at J.H.'s home "off and on" for the previous two years.

{¶16} In November 2020, the guardian ad litem ("GAL") moved to commit L.H. to the permanent custody of JFS. But JFS moved to terminate temporary custody of L.H. and remand custody to J.H. and sought protective-supervision orders.

{¶17} In March 2021, JFS filed a new motion for permanent custody of L.H., alleging that J.H. did not have stable housing and that it was concerned about her employment stability.

{¶18} In a May 2021 hearing involving L.H.'s siblings, a JFS caseworker testified that J.H. had been successfully discharged from parenting classes and individual therapy, but JFS was concerned that she had not found stable housing and, according to R.D., she was still in a relationship with him. J.H. testified that she did not have housing, was staying with her sister, and was actively looking for an apartment. J.H. testified that she was employed and was on probation. J.H. also stated that R.D. did not attend the in-home visits, but that she did tell JFS that there were times when R.D. would spend the night. J.H. denied that R.D. lived with her or that they were in a relationship. She testified that she had not seen R.D. since December 2020.

{¶19} In June 2021, the trial court held a custody hearing involving M.W. J.H.'s sister, S.P., testified that, just before the hearing, S.P. and her brother went to R.D.'s residence to retrieve J.H, who was living with S.P. at the time. J.H. had not come home and S.P. had not heard from her. S.P. testified that she "knew something was wrong" and that she "already knew the situation because of [R.D.'s] past history." The brother took a gun with him for protection because S.P. knew "what kind of person [R.D.] is." She found J.H. at R.D.'s home "beaten up," "bloody," and "had patches in her hair." S.P. went with J.H. to file a police report.

### Permanent-custody hearing

{¶20} The trial court held permanent-custody hearings for L.H. and his sibling in July, August, and September 2021.

{¶21} J.H. completed a diagnostic assessment form ("DAF") and parenting classes. She engaged in both domestic-violence services and individual therapy. But she did not have independent housing. J.H. was employed at Frisch's. She had been visiting the children. Supervised visits were being held at J.H.'s home, but they were moved back to the Family Nurturing Center ("FNC") due to J.H. losing her housing.

{¶22} R.D. never completed services. His history of domestic violence against J.H. "caused major concerns."

{¶23} As of the July 2021 hearing, JFS believed that R.D. and J.H. were still in a relationship because the "[June 2021] complaint that was filed by [J.H.] was dismissed."

{¶24} JFS believed permanent custody was in the children's best interest because, according to "different court documents," the domestic violence against J.H. by R.D. had "been going on and off since the case has been open," the relationship

between them had been "going back and forth," and some type of relationship was ongoing. The JFS caseworker testified that J.H. had admitted to her that she was not ready to have her children back.

{¶25} L.H.'s foster mother testified that L.H. was six weeks old when he was placed with her. He had more than 80 medical appointments to address his torticollis, which required him to wear a helmet. The foster mother informed J.H. of "the majority" of appointments in the first year of L.H.'s life but began to inform only JFS because J.H. only appeared for three appointments.

{¶26} J.H.'s therapist, Robert Perkins, testified that he provided emotional support and cognitive behavioral therapy. He testified that J.H. and R.D. had been in an on-again, off-again relationship. J.H. had told him that she had her own residence and R.D. "would visit the home sometimes." J.H. never disclosed any issues of domestic violence in her relationship with R.D. Perkins thought the issues had existed only before J.H. began therapy.

{¶27} J.H. testified that she had engaged in parenting classes and Women Helping Women services, completed individual therapy, and appeared for visits with L.H. J.H. testified that FNC never raised any issues about her parenting during the visits. J.H. stated that the foster parents were "doing a wonderful job" and that she was ready for her children to come home.

{¶28} J.H. testified that she was with R.D. "on and off" from about January 2018 until December 2019 when she gave birth to L.H.'s younger sibling, but the relationship ended at that point. They remained in communication. She testified that the protective orders were denied because service could not be obtained on R.D.

{¶29} J.H. testified about the incident in which her siblings found her at R.D.'s residence, bloodied and beaten. She said that R.D. had asked her to "take a ride with him" and "from there things just took a turn for the worse." She stated that she did not fear him, did not have a reason not to go with him, and that they had never had any incidents where she felt like he would harm her. She testified that R.D. "end[ed] up luring [her] to his house," R.D. did "a bunch of Ecstasy" where "the more Ecstasy he took, it's like the angrier he would get." R.D. went through J.H.'s phone, became angry that she was communicating with "other people," and began to threaten to make sure she did not get her children back. J.H. testified that she felt like she could not leave. J.H. said that R.D. did not want her to go to court the next day and that he had planned to ensure that she did not go. She stated that she was able to "talk him down" so that she could get out of the house and leave with her sister and brother. She conceded that he physically assaulted her on that day, which prompted her to file a police report, but that the police did not follow up and they told her that R.D. would have had to physically do something to her to get the restraining order.

{¶30} J.H. testified that she had not spoken to R.D., she had not had contact with R.D. since July 2021, she and R.D. were not together, she would not engage him in conversation if she encountered him, and she would call the police if he tried to threaten her. On cross-examination, J.H. conceded that she responded to R.D.'s Facebook messages and had telephone communication with him, but that he was now blocked.

{¶31} J.H. conceded that her therapist was correct in that she was in an on-again, off-again relationship with R.D. during the time that she was receiving therapy.

The juvenile court terminated J.H.'s rights

{¶32} In October 2021, the magistrate committed L.H. to JFS's permanent custody. Following objections, the juvenile court found that the magistrate properly determined the factual issues and applied the law, stating that "it is clear that the services * * * did not aid in the behavioral changes that were sought and are necessary in order for [her] children to safely return to her care" and that J.H. did not have independent, stable housing at the time of trial. The trial court stated the facts, that it conducted an independent review of the record, and did not "rewrite here a separate analysis from that of the magistrate, as the magistrate appropriately considered and weighed the necessary statutory factors." It adopted the magistrate's decision, which analyzed the statutory factors as follows.

*R.C. 2151.414(D)(1)(a) Interactions and Interrelationships*

{¶33} L.H. began living with his foster parents shortly after his discharge from the hospital when he was born. He had formed a bond with his foster family and his foster parents wished to adopt him. His foster parents had "made a significant commitment" by taking L.H. to approximately 80 medical appointments to address his special needs. J.H. did not attend the medical appointments, but she visited L.H. regularly and formed a positive bond with him. The court found that removing him from his foster home would be traumatic as it is the only home he had ever known.

*R.C. 2151.414(D)(1)(b) The Wishes of the Child*

{¶34} L.H. was three years old at the time of the permanent-custody hearing. His GAL supported committing him to JFS's permanent custody.

*R.C. 2151.414(D)(1)(c) Custodial History*

**{¶35}** L.H. had been living with his foster parents for nearly three years, almost his entire life.

*R.C. 2151.414(D)(1)(d) Child's Need for Legally Secure Permanent Placement*

**{¶36}** While placing L.H. with relatives would achieve the need for a legally secure permanent placement, it was only one factor to consider.

*R.C. 2151.414(D)(1)(e) Whether Factors in (E)(7)-(10) Apply*

**{¶37}** L.H. was abandoned by R.D. under R.C. 2151.414(E)(10). L.H.'s best interest required choosing between adoption by foster parents "with whom the child has lived almost since his birth" and relatives who wanted to assume legal custody of him. The magistrate and trial court concluded that it was in L.H.'s best interest to commit him to JFS's permanent custody.

## Standard of Review

**{¶38}** Parents have a paramount right to the custody of their children; therefore, the juvenile court's determination to grant permanent custody to JFS must be supported by "clear and convincing" evidence. *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. Clear and convincing evidence is evidence sufficient to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "We will not substitute our judgment for that of the trial court applying a clear-and-convincing standard where there is ample competent and credible evidence supporting the trial court's determination." *In re A.M.*, 1st Dist. Hamilton No. C-190027, 2019-Ohio-2028, ¶ 16.

**{¶39}** A review of the sufficiency of the evidence is different than a review of

the weight of the evidence. *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15. To determine whether there was sufficient evidence upon which to terminate parental rights, the court determines whether some evidence exists on each element. It is a test for adequacy and is a question of law. *Id.* at ¶ 15. When conducting a weight-of-the-evidence review in permanent-custody cases, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id.* at ¶ 16.

## Assignments of error

### *J.H. was afforded a fair hearing*

{¶40} J.H.'s first assignment of error asserts that the decision is unclear whether it was based on evidence that was heard during L.H.'s permanent-custody hearing. She points out that the magistrate's decision considered factual findings from related custody trials. J.H. raises due-process concerns, arguing that she was denied a fundamentally fair hearing.

{¶41} J.H. failed to raise this issue in her objections to the magistrate's decision, which confines our review to plain error. *See* Juv.R. 40(D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion* * *."); *In re J.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, ¶ 7. "Plain error is generally disfavored, however, and applied only in situations in which 'error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process * * *.' "

*Id.*, quoting *In re A.J. and S.M.*, 11th Dist. Trumbull No. 2010-T-0041, 2010-Ohio-4553, ¶ 40. To succeed on a plain-error review, the party claiming error must establish (1) that " 'an error, i.e., a deviation from a legal rule' " occurred, (2) that the error was " 'an "obvious" defect in the trial proceedings, ' " and (3) that this obvious error affected substantial rights, i.e., the error " 'must have affected the outcome of the trial.' "*In re J.M.*, 4th Dist. Ross Nos. 18CA3633, 18CA3634, 18CA3635, 18CA3664 and 18CA3665, 2018-Ohio-5374, ¶ 27, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

{**¶42**} The juvenile court held joint hearings for L.H. and his siblings. J.H. appears to argue that L.H.'s trial should have been severed from that of the other two children's trials. But R.C. 2151.35 provides that bifurcation of permanent-custody trials is required only where permanent custody is originally sought and no previous adjudication of dependency has occurred. We see no reason why the trial court should have bifurcated the hearings.

{**¶43**} Alternatively, J.H. may be arguing that because the magistrate's decision mentioned facts developed in other hearings, it depended on facts arising from those hearings. But the examination of witnesses specifically referred to each child. The court's legal conclusions and findings of fact were broken down by each child to avoid confusion as to what evidence was considered in each child's matter. The court considered evidence that was directly relevant to L.H.'s case.

{**¶44**} We do not find plain error. Therefore, J.H.'s first assignment of error is overruled.

*The trial court properly adopted the magistrate's decision*

**{¶45}** In her second assignment of error, J.H. argues that the juvenile court abused its discretion by adopting the magistrate's decision as it did not contain required consideration of the statutory factors. She argues in her third assignment of error that the magistrate's finding that permanent custody was in L.H.'s best interest was based on insufficient evidence and was against the manifest weight of the evidence. We disagree.

**{¶46}** Before terminating parental rights and granting permanent custody to a public child-services agency, a juvenile court must apply the two-pronged test established by R.C. 2151.414(B)(1). The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) permanent custody is in the best interest of the child under R.C. 2151.414(D)(1)(a)-(e). R.C. 2151.414(B)(1).

**{¶47}** The first prong of the permanent-custody test is satisfied when a child is in the temporary custody of JFS for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). There is no dispute that L.H. had been in JFS's custody for more than 12 of 22 months. R.C. 2151.414(B)(1)(d).

**{¶48}** The second prong of the test requires the juvenile court to determine whether permanent custody is in the child's best interest. *In re Allah*, 1st Dist. Hamilton No. C-040239, 2005-Ohio-1182, ¶ 10. The trial court is required to consider "all relevant factors," including five specific factors in the statute. R.C. 2151.414(D). Those factors are (1) the interactions between the child and parents, siblings, relatives, and foster family; (2) the child's wishes, which may be expressed through the GAL; (3) the child's custodial history; (4) the child's need for a permanent placement and

13

whether that can be achieved without granting JFS permanent custody; and (5) whether factors in R.C. 2151.414(E) apply. R.C. 2151.414(D)(1).

{¶49} The trial court properly considered the best-interest factors under R.C. 2151.414(D). It found that "it is clear that the services * * * did not aid in the behavioral changes that were sought and are necessary in order for [her] children to safely return to her care" and that J.H. did not have independent, stable housing at the time of trial. It incorporated the magistrate's analysis of the relevant statutory factors. It found that L.H. had lived with his foster family since shortly after he was discharged from the hospital after his birth, had a strong bond with them, and that removing him from their care would be traumatic as it is the only home that he had ever known. J.H. had never progressed beyond supervised visitation. Though L.H. was too young to express his wishes, his GAL supported permanent custody to JFS.

{¶50} The trial court's judgment was supported by clear and convincing evidence. L.H. was removed from J.H.'s home because she was in a violent relationship. She remained in a violent relationship with R.D., despite her completing the case-plan services. J.H. lacked stable housing. Finally, J.H. only attended three of more than 80 of L.H.'s medical visits. Clear and convincing evidence supports the trial court's finding that J.H. failed to demonstrate that she could provide a safe and stable home for L.H.

{¶51} Moreover, this is not one of those rare situations in which the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed.

{¶52} We overrule J.H.'s second and third assignments of error.

## Conclusion

{¶53} The decision to terminate a parent's parental rights requires serious consideration and should not be taken lightly. We have thoroughly reviewed the record and hold that it supports the juvenile court's judgment terminating J.H.'s parental rights and granting permanent custody to JFS. Therefore, we affirm the juvenile court's judgment.

Judgment affirmed.

**MYERS, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.