**[Cite as *In re E.H.*, 2022-Ohio-4701.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: E.H.

:    APPEAL NOS.  C-220424
                                 C-220428

:    TRIAL NO.     F08-1777-X

:

:    *O P I N I O N.*

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: December 28, 2022

*Kimberly V. Thomas*, for Appellant Mother,

*Christopher P. Kapsal*, for Petitioner-Appellant Aunt,

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, *Silvia Beck*, Assistant Prosecuting Attorney, and *Daniel Monk*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*ProKids* and *Jeffrey A. McCormick*, for Appellee Guardian ad Litem.

**CROUSE, Judge.**

{¶1}   Mother and her sister ("aunt") appeal from the Hamilton County Juvenile Court's judgment granting permanent custody of mother's child E.H. to the Hamilton County Department of Job and Family Services ("HCJFS") and denying aunt's petition for legal custody.  In these consolidated appeals, mother and aunt each assign error to the juvenile court's determination that permanent custody was in E.H.'s best interest.  For the following reasons, we affirm the judgments of the juvenile court.

### *Factual and Procedural Background*

{¶2}   E.H. was born in 2015 to mother and father.  Father, though sporadically involved in E.H.'s life in 2019, has not had any contact with E.H. or HCJFS since 2020.

{¶3}   E.H. became involved with HCJFS after mother called 241-KIDS in September 2018 because she was homeless and stated that she was overwhelmed. HCJFS subsequently did a wellness visit, and then on September 10, 2018, filed a motion for interim custody of E.H., a complaint for permanent custody of E.H., and a motion for a determination that reasonable efforts are not required based on mother's prior involvement with HCJFS.  *See* R.C. 2151.419(A)(2) (directing the court to "make a determination that the agency is not required to make reasonable efforts to * * * eliminate the continued removal of the child from the child's home, and return the child to the child's home" if the parent "has had parental rights involuntarily terminated with respect to a sibling of the child.").  A hearing was held the following day, and the magistrate granted the motion for interim custody and determined that reasonable efforts were not required.  Amended complaints were filed in October 2018 and November 2018.

{¶4}  An adjudication hearing was held on December 6, 2018.  E.H. was adjudicated dependent, and an allegation of abuse against mother was dismissed on December 19, 2018.  A disposition hearing was held on January 3, 2019, wherein all parties agreed to the disposition of temporary custody.  Mother was homeless at the time of this hearing.

{¶5}  Case-plan services were instituted, and required mother to complete a Diagnostic Assessment of Functioning and follow recommendations; obtain/maintain housing and income; complete a psychological assessment and engage in recommended treatment; participate in parenting classes; participate in the therapeutic intervention program ("TIP"); and participate in visitation with E.H. Father was ordered to cooperate with HCJFS, complete a DAF, and visit E.H.

{¶6}  Temporary custody was extended twice on HCJFS's motion—from September 2019 through March 2020, and then from March 2020 to September 2020. HCJFS then filed a motion for permanent custody on July 14, 2020.  Five months later, on December 10, 2020, aunt filed a motion for an emergency hearing and a petition for custody of E.H.  The court denied the motion for an emergency hearing.  HCJFS ordered an expedited home study for aunt in February 2021.  The home study did not approve aunt as a caregiver for E.H.

{¶7}  A five-day trial was held between September 2021 and January 2022 on HCJFS's motion for permanent custody and aunt's motion for legal custody.  On May 31, 2022, the magistrate recommended denying aunt's motion for legal custody and granting HCJFS's motion for permanent custody.  Both mother and aunt timely objected to the magistrate's decision.  On August 3, 2022, both objections were denied,

and the court approved and adopted the magistrate's decision. Mother and aunt each timely appealed.

### *Divergent Standards of Review*

{¶8} While mother and aunt articulate their assignments of error the same way, each argument is slightly different because different rights are at stake. Mother's argument solely challenges the court's grant of permanent of custody. She contends that the decision is not based on sufficient evidence and is against the manifest weight of the evidence. She asks this court to reverse the judgment, and to return E.H. to her custody.

{¶9} Aunt also challenges the evidence underlying the permanent-custody determination, and, at the same time, argues that the court erred in denying her petition for legal custody. However, as E.H.'s aunt, she is only able to challenge the court's decision to deny her motion for legal custody. This is because "[r]elatives seeking custody of a child do not have the same rights as natural parents" and "thus they cannot challenge the juvenile court's ruling on [the permanent-custody] issue." *In re L & M Children*, 1st Dist. Hamilton Nos. C-180598, C-180628 and C-180629, 2019 Ohio App. LEXIS 689, 21-22 (Feb. 22, 2019).

{¶10} Therefore, we review mother's assignment of error as it relates to the grant of permanent custody, and aunt's as it relates to the denial of her petition for legal custody.

{¶11} When this court addresses sufficiency-of-the-evidence challenges in the permanent-custody context it, "tak[es] a fresh look at the evidence to see whether it clearly and convincingly supports the court's decision." *In re M/E*, 1st Dist. Hamilton No. C-200349, 2021-Ohio-450, ¶ 8. Clear and convincing evidence is evidence that

4

" 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *In re L.H.*, 1st Dist. Hamilton No. C-220161, 2022-Ohio-2755, ¶ 38, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). In applying the clear-and-convincing standard, where there is "ample competent and credible evidence supporting the trial court's determination," this court must not substitute its judgment for that of the juvenile court. *In re A.M.*, 1st Dist. Hamilton No. C-190027, 2019-Ohio-2028, ¶ 16.

{¶12} When this court addresses a manifest-weight challenge in the permanent-custody context, it "consider[s] 'whether the [juvenile] court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed.' " *In re M/E* at ¶ 8, quoting *In re P/W Children*, 1st Dist. Hamilton No. C-200103, 2020-Ohio-3513, ¶ 27.

{¶13} However, when it comes to the denial of aunt's petition for legal custody, the review is slightly different, and we instead review the court's decision for an abuse of discretion. *In re D.Z.F.*, 1st Dist. Hamilton No. C-200260, 2020-Ohio-5246, ¶ 20; *see In re M/E* at ¶ 18 (explaining that "[w]e measure weight and sufficiency challenges to a legal custody determination differently" because residual parental rights are not at stake). A trial court abuses its discretion in this context "when its best-interest determination is not supported by competent and credible evidence." *In re F.B.D.,* 1st Dist. Hamilton No. C-180356, 2019-Ohio-2562, ¶ 11.

### *Mother's Assignment of Error: Permanent Custody*

{¶14} Our analysis on the permanent-custody side of this case is guided by the two-prong test of R.C. 2151.414(B)(1): A juvenile court may grant permanent custody only if it determines that one of the conditions in R.C. 2151.414(B)(1)(a) through (e) is

satisfied, and that permanent custody is in the best interest of the child considering "all relevant factors," including those set forth in R.C. 2151.414(D)(1)(a)-(e).

{¶15} It is undisputed that the first prong of the test is satisfied because E.H. has been in HCJFS custody for more than 12 months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). However, the parties dispute whether permanent custody is in E.H.'s best interest.

{¶16} R.C. 2151.414(D)(1) provides that when making a best-interest determination, "the court shall consider all relevant factors, including, but not limited to, the following":

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

6

{¶17} First, under R.C. 2151.414(D)(1)(a), the court considered E.H.'s relationship with his mother. All parties agree that E.H. is bonded with mother, and that mother was consistent with her visits. But, those visits were always supervised and were not always without conflict. Grace Badger, an HCJFS caseworker testified that at one visit in a local park mother grew very angry with E.H. and was yelling at him and calling him names like "lame" and "ugly." Badger testified that at another visit at a local park, the police were called due to mother's behavior. Deborah Schneider, a JusticeWorks supervisor, testified about an August 2021 incident at Smale Park that was "really bad" because mother "verbally abused" Schneider during the visit. Mother did not dispute that this occurred, but explained that "I was really hot and frustrated. * * * I felt like [Schneider] was overstepping a little bit." In response to these behaviors, the visits were periodically moved to a more supervised level of visitation. Schneider testified that mother always came prepared to the visits, could de-escalate when E.H. was upset, and that E.H. wanted to stay and play with his mother when the visits were over. Badger testified that E.H. said he loves his mom and his visits with her, and that he misses her, but sometimes said that "mom is mean."

{¶18} There were also concerns about mother's mental-health issues. The "Diagnostic Assessment of Functioning" lists diagnoses for unspecified depressive disorder, unspecified anxiety disorder, and a previous diagnosis of bipolar disorder. Mother testified at the January 28, 2022 hearing that she continues to work on her explosive behavior, but admitted on cross-examination that she continues to have outbursts in reaction to certain, triggering things, such as attorneys asking her questions during the trial. The court noted that on more than one occasion, security was needed in the courtroom in response to these outbursts. Mother testified that

7

while she was prescribed medication for her mental-health issues, the medication makes her too tired to work, so she only takes them as-needed. While the case plan ordered mother to engage in talk therapy, mother admitted discontinuing therapy after several sessions because therapy itself is triggering for her due to the time she spent in the foster care system as a child. Francoise Pierredon, a clinical counselor with TIP, testified that she met with mother for two therapy sessions, but at the second session mother "was so upset that we had to call security." After that, mother returned for "a few sessions" with a different provider.

{¶19} Additional concerns were raised about mother's relationship with P.K., whom E.H. knows as "Papa." Badger testified that E.H. "reported some sexual touching by [P.K.]" and that E.H. had exhibited sexualized behavior with other young children in a foster home. Pierredon testified that E.H. had named P.K. as his abuser when he was around three years old. Badger testified that mother claimed she was not involved with P.K. any longer, but that he came to at least one visit to "help set up" and would "have brief interactions with E.H." Badger testified that mother did not see an issue with P.K. being there, despite the allegations. Schneider testified that P.K. would simply bring things to the visits to help mother.

{¶20} Mother explained that she thought that P.K. "was cleared" and that "nothing was bad" and "nothing was going on." Badger testified, however, that once she realized mother had this impression, she clarified that the only way P.K. would not be an issue was if mother was no longer involved with him. Mother testified that she has since "cut all interactions with him."

{¶21} Mother's history of housing instability was also raised by the parties and considered by the court. Badger testified that she once showed up to a home visit at

8

the address given to her by mother and another person was living there. Badger testified that mother secured housing in the spring of 2021, but was evicted in May "due to a nuisance behavior." Then, mother said she had another apartment, but Badger testified that it was not a valid lease, and that the owner of the building had no record of her as a tenant. Currently though, mother has a two-bedroom apartment, with a room for E.H., and according to Schneider it has "been painted and the carpet is new. The furnishings are very nice. And she * * * takes a lot of pride in her apartment." While concerns were raised by HCJFS Supervisor Ralph Allen about mother's ability to afford the approximately $900 monthly rent, mother was working two jobs at the time of trial.

{¶22} The court also considered E.H.'s wishes, with regard to his age and maturity pursuant to R.C. 2151.414(D)(1)(b). The court found that E.H. had expressed an interest in returning to mother's home and E.H.'s *In re Williams* attorney advocated accordingly at trial, given the conflicting recommendation of the guardian ad litem ("GAL"). *See In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110. However, in a case involving similarly young children, we stated that this "factor is of minimal value in determining [a child's] best interest," given their young ages. *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 38.

{¶23} Under R.C. 2151.414(D)(1)(c), the court found that E.H. had been in the temporary custody of HCJFS for 38 months at the time of trial. This finding is well-supported in the record and is not in dispute.

{¶24} The court also considered E.H.'s need for a legally secure placement under R.C. 2151.414(D)(1)(d). A legally secure placement refers to more than just a

roof over one's head, rather, a legally secure placement, " 'encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.' " *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, at ¶ 42, quoting *In re K.W.*, 2018-Ohio-1933, 111 N.E.3d 368, ¶ 87 (4th Dist.) ("Mother's failure to comply with her case plan, along with the presence of grandmother at the home, provided clear and convincing evidence that mother was unable to provide a legally secure permanent placement."); *see In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (record supported a finding that parents were unable to provide a legally secure placement where parents were not grasping parenting concepts and were not truthful in mental-health evaluations.).

{¶25} The court considered that E.H. had been in multiple kinship and foster placements through the pendency of the case. Mother contends that E.H.'s numerous foster placements demonstrate that permanent HCJFS custody does not provide a legally secure placement, but the state contends that much of the disruption was due to mother's behavior. Badger testified that the high number of placements for E.H. is "[p]artially due to his behavior, partially due to some providers not wanting to engage with mother anymore." Allen testified at the January 24, 2022 hearing that E.H. was back in the same foster home that he previously had been in. Allen explained that he was only displaced from that home due to a fire.

{¶26} The court also considered testimony about E.H.'s mental-health challenges. Pierredon testified that, in addition to the sexualized behaviors, he exhibited "very clear symptoms of post-traumatic stress disorder" and was also diagnosed with ADHD and intermittent explosive disorder. In Pierredon's view, many of E.H.'s challenges come from a lack of stability. Mother's hesitancy to engage in

therapy was also considered. And while the record demonstrates that mother completed parenting classes, she did not fully participate in E.H.'s therapy, and did not complete her own therapy as directed by the case plan.

{¶27} Under R.C. 2151.414(E)(10), the court found that E.H.'s legal father had abandoned him, having not visited him since September 2020. This finding is well-supported in the record and is not in dispute. Similarly, under R.C. 2151.414(E)(11), the court found that mother had her parental rights terminated with regard to a sibling of E.H. This finding is also supported in the record and is not in dispute.

{¶28} After thoroughly reviewing the record and the trial court's analysis, we conclude that the trial court's judgment was based on sufficient evidence and was not against the manifest weight of the evidence. The record clearly and convincingly supports the court's decision to grant permanent custody to HCJFS. Moreover, in resolving the few conflicts that there were in the evidence, we cannot say that the trial court lost its way. For these reasons, mother's assignment of error is overruled.

### *Aunt's Assignment of Error: Legal Custody*

{¶29} On the legal-custody side, when a child has already been adjudicated abused, neglected, or dependent—as is the case here—the court's focus is on the child's best interest. *In re M/E*, 1st Dist. Hamilton No. C-200349, 2021-Ohio-450, at ¶ 19. To make this best-interest determination, "courts are permitted to use R.C. 2151.414(D)(1) (the permanent-custody factors discussed above) or R.C. 3109.04(F) (factors used for private custody disputes)." *Id.*, citing *In re E.R.M.*, 1st Dist. Hamilton No. C-190391, 2020-Ohio-2806, ¶ 16.

{¶30} In this case, the court reviewed the factors set forth in R.C. 2151.414(D), starting first with E.H.'s relationship with aunt. Under this factor, the court found that while aunt had stable employment and housing, her failed home study, prior involvement with HCJFS, and lack of insight into the tumult in E.H.'s life disqualified her from obtaining legal custody. The record supports these findings.

{¶31} Central to the failed home study was aunt's prior HCJFS involvement and trouble with the law. The home study report explains that aunt had instances of substantiated physical abuse in 2005 and 2007, including a SWAT call to her then-partner M.D.'s home "due to an allegation that drugs were being sold out of the home. [M.D.'s] children were present at the time. [Aunt] was found with cocaine and 2 guns in her possession. Prior to SWAT coming to the home, [Aunt] sold drugs to an undercover officer." In 2008, an unsubstantiated allegation of abuse was documented wherein M.D.'s daughter "reported that she was slammed into a door by [aunt] resulting in her losing her tooth." The home study report detailed additional criminal history associated with felony drug sales in 2007, drug trafficking in 2012, and a criminal damaging misdemeanor in 2009. Aunt testified that her time in prison changed her, and she has since been living a law-abiding life. She added that she has cut ties with M.D. since then, however, Stephanie Hunter, the home study assessor, noted in the home study report that aunt was on a FaceTime call with M.D. during the home visit, and listed M.D. as a collateral source and support. Also concerning to the court was aunt's lack of insight into E.H.'s life, including the fact that aunt did not know, for several years, that E.H. was even in foster care.

{¶32} On the other hand, aunt testified that she has lived in the same apartment for four years and works two well-paying jobs. Schneider testified that aunt

has "always been a calming presence * * * always been positive." Aunt testified about one such visit she attended with mother, where she was able to help mother and E.H. calm down and avoid a conflict. Mother testified aunt would be a great mom for E.H. And while aunt testified "I don't know how to be a mom," she added that "I do know what it feels like to be loved, and that's what—that's the biggest thing here." She also expressed a desire to continue E.H.'s involvement in therapy. She testified that she had not researched options for daycare or schooling.

{¶33} When considering E.H.'s need for a legally secure placement, the court noted concern with aunt's lack of insight into the severity of mother's and E.H.'s mental-health challenges. Aunt testified, "I don't know anything about [mother's] mental health." Overall, the record demonstrates that aunt had little to no insight into the current state of E.H.'s or mother's therapy, but Aunt admitted that this was because she does not have a strong relationship with mother and because HCJFS would not tell her any information about E.H.

{¶34} Based on our review of the record as it relates to aunt, we cannot say that the trial court abused its discretion in denying aunt's petition for legal custody. While aunt certainly seems to have a strong relationship with E.H. and has turned her life around, the court's best-interest determination was supported by competent and credible evidence.

### *Conclusion*

{¶35} In light of the foregoing analysis, both mother's and aunt's assignments of error are overruled. The judgments of the juvenile court are affirmed.

Judgments affirmed.

**ZAYAS, P. J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

