[Cite as *In re L.N.*, 2024-Ohio-2571.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re L.N.

Court of Appeals No. H-23-025

Trial Court No. DNA0202200070

## DECISION AND JUDGMENT

Decided: July 3, 2024

* * * * *

Richard H. Palau, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} This is an appeal from a September 12, 2023 judgment of the Huron County Court of Common Pleas, Juvenile Division, which transferred legal custody of the minor child, L.N., from K.T. ("mother") to the child's caregivers, K.H. and J.D. On appeal, mother claims that she remedied the conditions that led to her daughter's removal and therefore that legal custody should be returned to her. For the following reasons, we affirm the trial court's judgment.

## I.  Facts and Procedural History

{¶ 2} This case began with the filing of a two-count complaint in dependency by the Huron County Department of Job and Family Services ("HCJFS") on June 27, 2022, just days after L.N.'s birth.  According to the complaint, mother and L.N.'s meconium tested positive for marijuana.  Mother has four other children, who were previously adjudicated as dependent children and removed from mother's care.  The complaint alleges that mother "does not have unsupervised contact" with them and also that mother recently "assault[ed] someone in the presence of her children."  HCJFS alleged that mother "struggle[s] to manage her anger, continuing to have verbal and physical outbursts involving the police."  Following an emergency shelter care hearing, L.N. was placed in mother's temporary custody, under the protective supervision of HCJFS.  Carrie Kimmit was appointed as L.N.'s guardian ad litem, and L.N. and mother were appointed separate counsel.

{¶ 3} Following paternity testing, J.R. Jr. was identified as the father to L.N., but he did not participate in these proceedings, nor was he included in the case plan.

{¶ 4} L.N. remained in mother's care for two months, until August 17, 2022, when another emergency shelter care hearing was held, following an incident between mother, her mental health counselor and the caseworker, Tevon Oehling.  It was alleged that mother became "more and more agitated" during a meeting and that, while holding L.N., she failed to support L.N.'s neck and head.  Mother was asked to participate in a "safety plan," which she allegedly declined, instead leaving the facility with L.N.  JFS notified

2.

the trial court which, sua sponte, ordered law enforcement to locate and take immediate custody of L.N., which occurred later that day and without incident. The trial court placed L.N. in the temporary custody of her maternal great grandmother, A.C., with JFS having protective custody.  Later, when asked about the incident at the counseling office, mother testified that the caseworker "lied" to the court and that L.N. was removed on "[un]just grounds because there was * * * dishonesty there in her removal."

{¶ 5} An adjudicatory hearing was held on September 8, 2022.  At that time, mother stipulated to a finding of dependency as to Count 1 of the complaint, and the state dismissed Count 2.  Following the hearing, L.N. was placed with K.H. and J.D.

{¶ 6} Mother's case plan, which was approved by the trial court on September 22, 2022,  ordered that she continue all mental health treatment "to address her anger management and mental health;" avoid displaying any "physical or verbal aggression" toward others or engaging in "any fighting or arguing in the presence of children;" follow the law; maintain employment; "not associate with any known people who are actively using substances;" not "be rude or disrespectful" to Kinship or agency staff; and submit to random drug screens.

{¶ 7} On May 17, 2023, K.H. and J.D. filed a motion in the juvenile court seeking legal custody of L.N.  Mother filed her own motion for legal custody on July 11, 2023, and a hearing was held on the matter on September 5, 2023.  A summary of the evidence presented at the hearing is set forth below.

3.

**{¶ 8}** K.H. is a second cousin to L.N. She and her girlfriend, J.D., both aged 19, have lived together for two years and, as of the hearing, had temporary custody of L.N. for one year. Both women attended the hearing, but only J.D. testified.

**{¶ 9}** J.D. and K.H. are both employed in the restaurant industry. K.H. works fewer hours and is L.N.'s primary caretaker. K.H. frequently cares for mother's other two daughters (and siblings of L.N.), named "M" and "L." The couple live in an upstairs unit of a home, owned by K.H.'s father, who lives downstairs. K.H.'s father was ordered to have no unsupervised contact with L.N., based on his criminal record.

**{¶ 10}** J.D. testified that she and K.H. have provided a "happy, healthy, [and] safe" home for L.N., and she described L.N. as "thriv[ing]" and "happy." J.D. testified that if she and K.H. are granted legal custody of L.N., she would insist that any visitation between mother and L.N. be supervised because she does not "feel comfortable with [mother having] unsupervised" visits with L.N. She denied any issues with mother and believes that a visitation schedule could be agreed upon "without involving the court."

**{¶ 11}** Ongoing-caseworker, Tevon Oehling, described K.H. and J.D. as "very active" and "focused" on L.N., as well as L.N.'s sibling, M, whom they "have a lot." Oehling admitted to feeling "worried at first" that K.H. and J.D. were too young to handle the responsibility of caring for a young child, but said that, "overall, they have been excellent" and are "doing a great job." She cited their frequent planning of family events and making sure that L.N. gets to her doctors' appointments. Oehling testified that HCJFS is "in agreement" with the couple's motion for legal custody. Similarly, the

4.

GAL, who visited the home of K.H. and J.D., also recommended that their motion for legal custody be granted.

{¶ 12} The remainder of the hearing, and significantly more testimony, concerned mother.

{¶ 13} Carrie Kimmet has served as the GAL in all of mother's cases. She estimated that she met with mother six times in this particular case and provided a synopsis of the issues mother faces. She testified that mother's "history * * * played a lot into this case" and that, although mother has "presented significantly better than she did in the other cases, * * * she was in a really deep hole to begin with." The GAL expressed specific concern that mother is "isolated" and has "little to no support." To her knowledge, mother does not have "one healthy reliable person" that she can rely upon, adding that mother "burn[ed] a lot of bridges in her family and in this town." Mother also lacks a car or "any savings," making visitation and appointments difficult to keep. The GAL said that her most "significant concern" was the company that mother keeps, specifically referring to A.J., who has "significant substance abuse problems," and someone mother promised to avoid.

{¶ 14} In the spring of 2023, mother was making progress in her case-planning, and the GAL was "prepared to recommend some very limited unsupervised [visitation] with L.N.," until she learned that mother had been convicted with criminal trespassing at a grocery store and that A.J. had been with her at the time. She believes that mother was not "forthcoming" about the incident, because, while mother claimed that she "ran into"

5.

A.J. at the store, footage from the store's video camera showed the two of them entering and exiting the store at the same time. The GAL testified that mother's trespassing conviction is "concerning," but the "bigger concern" was mother associating with A.J.

{¶ 15} Mother was also "not truthful" about her mental health care. The GAL learned that mother had missed an appointment, also in the spring of 2023, resulting in her having to forego her medications for "some time." The GAL was "not able to get an accurate story from [mother]," and mother told "different stories" to the GAL and to HCJFS.

{¶ 16} The GAL described "writings," written by mother on the walls outside of her apartment that were "concerning. While she believes that mother initially wrote messages to counter something "profane" that the neighbor had drawn, mother "continued" to cover the walls with "more and more * * * biblical sayings." Mother told the GAL that writing on the walls was "her coping mechanism [for] deal[ing] with the stress in her life." Mother's explanation "didn't sit well" with the GAL. As she explained, "I had hoped that [mother] was addressing [stress] through her mental health counseling, but to find out then that she wasn't always attending, just cause[d] more concern." Caseworker Oehling was also asked about the writings. She speculated that mother may have written those messages when she was "off her medications possibly," and she took pictures to show mother's counselor.

{¶ 17} Visitation was a frequent topic during the hearing. In the past, mother had supervised visitation with her other children at Kinship House in Huron County.

6.

However, mother is no longer allowed there, due to "a past case with her other children." According to the GAL, there are "no individuals willing to supervise mother's visits," including with L.N. And, although there are "multiple other supervised facilities in the area," mother's lack of transportation and money present additional barriers. The GAL expressed "worry" that regular visits between mother and L.N. will not happen. However, despite the "import[ance]" of those visits, the GAL opined that it is not "safe" for L.N. to have unsupervised visits with mother, given "mother's pattern and history of mental illness and instability."

{¶ 18} During caseworker Oehling's testimony, she said that mother's missed mental health appointments in 2023, which "led to her not having meds * * * for a little bit," was "a concern" for the agency because mother's mental health was the "main reason for [the agency's] involvement." Mother told Oehling that she had only missed "a day or so" of her medication. But, when confronted with the fact that the medication would have shown up in her drug screen, mother admitted that "it might have been seven days." The caseworker followed up with mother's prescriber and learned that she had been without her medication for "30 days or so."

{¶ 19} Oehling expressed the same concern as the GAL "about people [mother] associates with," in particular mother's "neighbor," A.J. At hearing, Norwalk Police Officer Timothy Skinner, who testified about mother's criminal trespassing charge, confirmed that he has personally responded to "several matters" involving A.J., including

7.

"trouble with her husband [and] other people in [their apartment] complex, [and] narcotics complaints."

{¶ 20} Mother denied to Oehling that she hung out with A.J. after the trespassing incident, but according to Oehling, "it's hard to know." Oehling testified that she receives "frequent" calls *about* mother from "people" who are reporting her for bad behavior. She attributed those calls to the fact that mother is "not well liked in her * * * area" and that she has "a lot of problems with a lot of people." Oehling said that some of the calls "pan out" and some do not. In Oehling's view, mother "has been doing better at maintaining her behaviors," but she does get "caught up in almost like manic behaviors," such as texting with relatives. According to Oehling, mother has constant issues with her family, which can cause her to "spiral[]" and texting that "escalates" and goes "back and forth, back and forth, back and forth."

{¶ 21} Finally, Oehling testified that although mother works two jobs, she was not able to maintain her utilities and went without electricity for four (4) months preceding the hearing.

{¶ 22} Mother called two witnesses. First to testify was Makayla Patchen who works as a "home visitor" for Help Me Grow with the Huron County Board of Developmental Disabilities. Patchen's job is to offer "family support" for prenatal mothers and families with young children. HCJFS referred mother to Help Me Grow after L.N. was born, and mother "voluntarily" agreed to work with the program. Based

8.

upon Patchen's 10 to 12 "observational visits" of mother and L.N., Patchen opined that the two have a strong bond, and she denied having any concerns regarding mother's care.

{¶ 23} Mother also called Cory Long, whose job includes supervising visits at HCJFS. Long observed visits between mother and L.N. over a two-year period and described mother as "always very affectionate" and "caring." Long concurred that mother and L.N. appeared to have a strong bond, and he too had "no concerns" regarding mother's care.

{¶ 24} Mother testified last. First, she described her two-bedroom home, which she maintains "nicely," and which is equipped with beds for all of her children. L.N., who lived with mother for the first two months of her life, has one of the bedrooms which is decorated for a little girl. Mother said that her electricity was turned off temporarily because she "stopped paying the bill," not for a lack of funds but rather over a dispute with a neighbor.

{¶ 25} Mother agreed that she is "on [her] own" and that her family has shown "an unwillingness to show any support for [her]." Although an elderly woman living next door was willing to provide care for L.N. and to supervise visits, HCJFS would not allow either.

{¶ 26} Mother testified that she has made "substantial progress" with her case plan. For example, mother "maintained her housing" by paying her rent, even without any governmental assistance, which she lost when L.N. was removed. The loss of income prompted mother to look for a new, second job. As of the hearing, mother was

9.

working between 40 and 50 hours per week, between Bob Evan's Restaurant and Arby's, but she anticipated being hired for a factory job to replace Arby's. Mother's work schedule "fluctuates," but generally, she works for Bob Evans from 3 p.m. to 10 p.m., four days per week, and the factory job will be a second shift position. Mother testified that the increase in income would "certainly help" with maintaining housing and utilities. She also hopes to buy a car and hire a lawyer to help her "refile for [her] children." Mother testified that she is making her court-ordered child support payments for all of her children, which she estimated was about $500-$600 dollars per month.

{¶ 27} Regarding her mental health, mother began receiving counseling services at Bayshore, "when [she] was pregnant with [L.N.]." Mother switched to Bayshore from another provider because she thought she would "get better services." Mother has also treated with medication, for "four or five years," which help her to "regulate" her moods and "manage [her] trauma triggers" caused by "a lifetime of abuse." Mother agreed that counseling and medication have "absolutely" helped her.

{¶ 28} Mother admitted that that she missed taking her medication for "about a week," after a missed appointment with her prescriber, which she blamed on the fact that she "had just gotten a second job." She denied "intentionally" missing the appointment.

{¶ 29} Regarding the trespassing incident, mother testified that she did not intend to grocery shop with A.J. But, while walking from her home to the store, A.J. yelled from behind, "wait up," and mother acquiesced, to be "polite and cordial." At the time, mother had "a lot of concerns" that A.J. was "high on drugs." Mother claimed that A.J.

10.

followed her into the store and rejoined her later, outside. As for trespassing, mother said that she was "fairly confident" that she was no longer barred from going to the shopping center where the grocery store is located, and she was "shocked" when she was cited. Mother claimed that she was jailed for the offense because, "although it was a simple mistake, it was [her] second offense."

{¶ 30} Mother asserted that "first and foremost," she would like custody restored to her and that it would be in L.N.'s best interest to "be with her mother." She added that K.H. and J.D. would be her "first choice for babysitters" because they have been "very active" in her "children's lives." Mother agreed that K.H. and J.D. have been "pretty good provider[s]," and she described J.D., in particular, as a "very sweet and calm woman" and "very loving [and] gentle" with her children. Mother even testified that L.N. is as "about as happy with [K.H.] and [J.D.] as she is when she's with [mother]."

{¶ 31} If custody is not returned, then mother would like visitation. Mother feels that she has "definitely earned the right to be alone with [L.N.]" and "absolutely want[s] [that] right." She argued, repeatedly, that she should be allowed to "resume" caring for L.N. in the absence of any evidence that L.N. was "in danger or at risk of immediate harm" while in mother's care. Mother added that she "feel[s] like a criminal," given the restrictions on visitation.

{¶ 32} By decision dated September 12, 2023, the juvenile court placed L.N. in K.H.'s and J.D.'s legal custody. It granted mother supervised parenting time "by a person or facility approved in advance" by the legal custodians. It also ordered that

11.

K.H.'s father continue to have no "unsupervised contact with L.N." Mother appealed, assigning a single assignment of error:

**Assignment of Error I**: The Trial Court erred by granting the caregivers motion for legal custody where the evidence presented at the trial demonstrated that it was not in L.N.'s best interest and where Mother was compliant with case plan services.

## II. Standard of Review and Legal-Custody Principles

{¶ 33} Parents have a "significant private interest [in the] care, custody, and control of their children." *In re B.C.*, 2014-Ohio-4558, ¶ 19, citing *Troxel v. Granville*, 530 U.S. 65 (2000). Indeed, the right to raise one's child is an "essential" and "basic civil right." (Citation omitted.) *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "[P]arents who are 'suitable' have a 'paramount' right to the custody of their children." *In re B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977).

{¶ 34} Because custody issues "are some of the most difficult and agonizing decisions a trial judge must make, a trial judge must have wide latitude in considering all the evidence * * * and such a decision must not be reversed absent an abuse of discretion. (Citation omitted.) *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). As applied in custody cases, that means, "[w]here an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court. (*Trickey v. Trickey*, 158 Ohio St. 9 (1952), approved and followed.)" *Id.* quoting *Bechtol v. Bechtol*, 49 Ohio St.3d 21

12.

(1990), syllabus. The reason for this standard of review is that "the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness." *Id.,* citing *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80-81 (1984). Therefore, a reviewing court "should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Id.*

{¶ 35} R.C. 2151.353(A) lists the dispositional options available in abuse, neglect and dependency cases. As relevant here, R.C. 2151.353(A)(3) authorizes a juvenile court to "[a]ward legal custody of [a] child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child." Legal custody proceedings "vest in the custodian the right to have physical care and control of the child, subject to any residual parental rights and responsibilities that remain intact with the birth parents." *In re A.V.,* 2019-Ohio-1685, ¶ 13 (6th Dist.) citing *In re C.R.,* 2006-Ohio-1191, ¶ 14-15.

{¶ 36} The statute does not contain "any predicate conditions that a trial court must find before awarding a nonparent legal custody." *Matter of S.M.,* 2023-Ohio-2686, ¶ 42-43 (4th Dist.). Instead, R.C. 2151.353(A)(3) provides that the person identified in a complaint or motion as the "proposed legal custodian shall be awarded legal custody of the child only if the person identified signs a statement of understanding" that contains the following provisions: (a) the person intends to "become the legal custodian of the

13.

child and * * * is able to assume legal responsibility for the care and supervision of the child;" (b) the person "understands that legal custody of the child in question is intended to be permanent in nature * * *;" (c) the parents of the child have "residual parental rights, privileges, and responsibilities, including, but not limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support;" and (d) the person understands that she must attend the dispositional hearing "in order to affirm the person's intention to become legal custodian * * *."

{¶ 37} The record before us includes the motion for legal custody filed by K.H. and J.D. but not a "statement of understanding." Mother did not object at trial to the absence of a statement, nor has she raised the issue on appeal. And, even if she had assigned it as error, the failure to file a statement of understanding is not plain error when "the party seeking legal custody has provided testimony at a hearing reflecting [her] intention to provide a home for the [child], and the testimony further demonstrates an understanding of, and commitment to, being the [child's] legal custodian." *In re E.Z.-S.*, 2019-Ohio-1177, ¶ 26 (6th Dist.), quoting *In re J.R.P.*, 2018-Ohio-3938, ¶ 27 (7th Dist.). K.H. and J.D. attended the hearing, and testimony was offered as to all of the elements set forth in R.C. 2151.353(A)(3)(a)-(d).

### III.  The trial court's best interest finding was not an abuse of discretion.

**{¶ 38}** In a private-custody dispute, "a trial court must make a parental unsuitability determination on the record before awarding legal custody of the child to the nonparent." *In re Hockstok*, 2002-Ohio-7208, syllabus.  However, in an abuse, neglect, or dependency case, such as the case before us, a juvenile court's abuse, neglect, or dependency adjudication "implicitly involves a determination of the unsuitability of the child's parents." *In re C.R.*, 2006-Ohio-1191, ¶ 23.  "Consequently, a trial court need *not* find a parent unsuitable before awarding legal custody of an adjudicated abused, neglected, or dependent child to a nonparent."  (Emphasis added.)  *Matter of S.M.,* 2023-Ohio-2686 at ¶ 36 (4th Dist.), citing *In re C.R.*  Instead, the finding of abuse, neglect, or dependency during the adjudication stage "essentially substitutes as a parental unsuitability determination, and at the dispositional stage, the juvenile court's primary consideration is the child's best interest.  *Id.,* citing *In re D.A.*, 2007-Ohio-1105, ¶ 11 ("Once the case reaches the disposition phase, the best interest of the child controls"); *In re Cunningham*, 59 Ohio St.2d 100, 108 (1979) (Establishing that "the welfare and 'best interests' of the child are the primary considerations in a dispositional hearing"); *See also* R.C. 2151.42(A) ("At any hearing in which a court is asked to modify or terminate an order of disposition issued under section 2151.353 * * * of the Revised Code, the court, in determining whether to return the child to the child's parents, shall consider whether it is in the best interest of the child.").

15.

**{¶ 39}** The trial court's finding—that legal custody to the parent or other person is in the child's best interest—must be supported by a preponderance of the evidence. *In re A.V.,* 2019-Ohio-1685, at ¶ 13; *see also, In re K.L.V.W.*, 2023-Ohio-1287, ¶ 28, 30 (8th Dist.). A "preponderance of the evidence" is "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it." *In re B.P.*, 2010-Ohio-6458, ¶ 43 (4th Dist.), quoting Black's Law Dictionary (6th Ed.1998).

**{¶ 40}** Here, the trial court found, and mother admitted, that L.N. was a "dependent child," under R.C. 2151.04(C) at the September 8, 2022 adjudicatory hearing. Therefore, the primary issue to be resolved at the dispositional hearing was L.N.'s "welfare and best interest," and not whether mother was "either fit or unfit." *Cunningham* at 106, 108.

**{¶ 41}** R.C. 2151.353(A)(3) does not list any certain factors that guide the best interest determination. Therefore, this court and others "have looked to the best interest factors of R.C. 2151.414(D) [Regarding Permanent Custody], R.C. 3109.04(F)(1) [Regarding Shared Parenting], a combination of the two, or general notions of what should be considered regarding the best interests of the [child]." *In re A.V.* at ¶ 14, citing *In re E.H.*, 2016-Ohio-8170, ¶ 16 (6th Dist.); *See also Matter of S.M.* at ¶ 39 (Citing cases). The best interest subdivision of each statute provides that the trial court "shall consider all relevant factors," which specifically include the following:

> • The wishes of the child's parents regarding the child's care. R.C. 3109.04(F)(1)(a).

16.

• The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest. R.C. 3109.04(F)(1)(c).

• The child's adjustment to the child's home, school, and community. R.C. 3109.04(F)(1)(d).

• The mental and physical health of all persons involved in the situation. R.C. 3109.04(F)(1)(e).

• The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights. R.C. 3109.04(F)(1)(f).

• The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period. R.C. 2151.414(D)(1)(c).

*Id.* at ¶ 14.

{¶ 42} In its final dispositional order, the trial court found that K.H. and J.D. have provided "excellent care" and have been "actively engaged" with L.N., attending to her medical needs and facilitating contact between L.N. and her siblings. It concluded that a grant of legal custody to K.H. and J.D. was in L.N.'s best interest. Conversely, it found that a grant of legal custody to mother, or even *un*supervised visitation with L.N., would

17.

not be "appropriate * * * due to the continuing cycles of volatility and manic behavior historically demonstrated by [mother] over the last 5 years."

{¶ 43} Mother sets forth no specific argument regarding L.N.'s best interest or any particular best-interest factor, and "we will not construct an argument for her." *Accord Matter of S.M.* at ¶ 40. We do note that there are no facts to suggest that the trial court acted unreasonably, arbitrarily, or unconscionably when it determined that an award of legal custody to K.H. and J.D. is in L.N.'s best interests. Further, the trial court's conclusion comports with the best interest testimony offered by the HCJFS caseworker and the GAL. *In re C.F.*, 2007-Ohio-1104, at ¶ 56 (observing that "[t]he trial court has discretion to accept the testimony of the guardian ad litem on the child's wishes"). Even mother concedes that K.H. and J.D. are "pretty good provider[s]" and that L.N. is "about as happy" with them as she is with mother.

{¶ 44} Rather than challenge the trial court's best interest finding, mother argues that she substantially complied with case planning services which, according to her, should result in L.N.'s return. Mother relies primarily on the fact that she has maintained her housing and employment. On the other hand, she concedes that she failed to take her medication "for that short period of time" and that she "interact[ed]" with a known drug user, but she argues it would be "ludicrous" to "strip her of her [parental] rights for a single incident."

{¶ 45} Again, "[p]arental interests must be subordinated to the child's interest in determining an appropriate disposition." *Cunningham* at 106. Thus, even if mother did,

18.

as she claims, substantially remedy her unsuitability, the trial court did not have a duty to return L.N. to her care. *Accord Matter of S.M.* at ¶ 41. Further, the trial court *did* consider mother's progress in this case. It found that mother's compliance with "many aspects of the case plan" was "followed by periods of [noncompliance]," which it found was an "unfortunate[] * * * pattern that has haunted [mother] for years." The judgment entry also includes a number of specific case plan violations, including mother being "verbally abusive" while visiting a local Salvation Army, being convicted of a crime, "consort[ing]" with a drug user, and engaging in "manic behavior with her family members." The trial court was free to consider the degree to which mother complied with her case plan, and we find competent and credible evidence supports the trial court's findings. *See, e.g., In re B.P.,* 2021-Ohio-3148, ¶ 57 (4th Dist.) (Case plan compliance "may be a relevant, but not necessarily conclusive factor when a court evaluates a child's best interest.").

## IV. Conclusion

{¶ 46} After reviewing the record, we find that the trial court did not abuse its discretion in granting legal custody of L.N. to K.H. and J.D. The court considered all relevant best interest factors before awarding custody, and its decision in weighing those factors in favor of K.H. and J.D. is supported by a preponderance of the evidence. That determination is not arbitrary, unconscionable, or unreasonable. Accordingly, mother's assignment of error is found not well-taken.

**{¶ 47}** The judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the court costs of this appeal pursuant to App. R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.               _____

                                                    JUDGE

Gene A. Zmuda, J.

                                          _____

Myron C. Duhart, J.                                              JUDGE
CONCUR.

                                          _____

                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.