**[Cite as *In re M.E.*, 2021-Ohio-450.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: M/E.                 :        APPEAL NO. C-200349
                                      TRIAL NO. F16-2302X

                                    :          *O P I N I O N.*

Appeal From:   Hamilton County Juvenile Court

Judgment Appealed From Is:   Affirmed

Date of Judgment Entry on Appeal:   February 19, 2021

*Jon R. Sinclair*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Mary M. Salyer*, Assistant Public Defender, for Guardian ad Litem for the minor children.

**BERGERON, Presiding Judge.**

{¶1}     In this parental custody case involving two children, the juvenile court granted permanent custody of one child to Hamilton County Department of Job and Family Services (HCJFS) and legal custody of the other to a relative.  Mother now appeals, presenting one assignment of error, challenging the court's decision as against the weight and sufficiency of the evidence.  After carefully reviewing the record, we conclude that the evidence supported the juvenile court's decision, and we therefore affirm its judgment.

I.

{¶2}     This case began in October 2016 when HCJFS obtained interim custody of Mother's two children: J.M., a three-year-old boy; and C.E., a seven-year-old girl.  C.E. had come to school distraught after having an altercation with Mother, and upon further inquiry, reported that Mother instructed her not to come home after school.  C.E. also expressed fear of returning home because Mother belittled her with derogatory language and whipped her with a belt.  Beyond those concerns, she had anxiety regarding whether Mother would be able to provide adequate food for the family.  These fears arose against a backdrop of Mother's intermittent homelessness and untreated anger and mental illness challenges, including bipolar disorder and posttraumatic stress disorder.  Violence was also an issue, as Mother previously lost custody of her two children after assaulting police officers.  Additionally, neither child's father had any contact with them since the outset of this case.

{¶3}     The court adjudicated the children neglected and dependent in January 2017, and HCJFS obtained temporary custody of both children a few

2

months later. The children remained in foster care until March 2019, when Mother's brother and sister-in-law agreed to take both children. That move proved beneficial for C.E., who assimilated into her aunt and uncle's family, bonding with the other children and thriving in school. However, J.M.'s extensive health and psychological challenges proved too daunting for the aunt and uncle. He suffers from a serious heart condition that requires ongoing evaluation and medication, intermittent explosive disorder, and a chromosomal issue. After being removed from his aunt and uncle's home, J.M. spent time at Children's Hospital Medical Center and the crisis stabilization unit at St. Joseph Orphanage. He was then placed back with a former foster family (in conjunction with participating in a day program through Positive Leaps), where he remained through the hearing.

{¶4} Unfortunately, a series of setbacks punctuated Mother's efforts to reunite with her children. She proved unable to maintain consistent housing, cycling in and out of homelessness throughout this case. And her anger and mental illness challenges plagued her visits with her children. For example, St. Joseph banned Mother from visiting J.M. because she threatened another child after the child approached J.M. on the playground. When visiting C.E., Mother would repeatedly bring up C.E.'s past experiences with sexual abuse, which greatly distressed her daughter. Mother also told C.E. that she had to sell her own blood to be able to visit (needless to say, compounding the anxiety). Additionally, Mother has not been able to identify the services that she would provide for J.M.'s needs, and she previously indicated her intent to discontinue his medications if she regained custody (posing a severe threat to J.M.'s health).

3

{¶5} Beyond her interactions with her children, we see flashes of danger in Mother's relations with others. For example, she threatened to strike her brother's and sister-in-law's knees with a baseball bat in retaliation for perceived issues arising out of their efforts to raise her children. This pattern of hostility carried over to her caseworker, with Mother threatening violence to herself and others. And even though her case plan required anger management treatment, she did not begin treatment until December 2019, over three years after this case commenced.

{¶6} Without seeing sufficient progress, HCJFS eventually asked the juvenile court to grant permanent custody of J.M. to the agency, and legal custody of C.E. to her aunt and uncle. On this record, the magistrate granted HCJFS's request, and the juvenile court adopted the magistrate's decision, determining that it was no longer in the children's best interest to be reunited with Mother. The court granted both custody motions, and Mother now appeals.

{¶7} On appeal, Mother pursues one assignment of error, depicting the juvenile court's decision as not supported by sufficient evidence or consistent with the manifest weight of the evidence. Because we review permanent custody under a different legal standard than legal custody, we consider Mother's challenge to each child separately.

II.

A.

{¶8} When reviewing a grant of permanent custody, we address sufficiency challenges by taking a fresh look at the evidence to see whether it clearly and convincingly supports the court's decision. *See In re C. Children*, 1st Dist. Hamilton Nos. C-190650 and C-190682, 2020-Ohio-946, ¶ 8 ("When reviewing a juvenile

court's grant of permanent custody, we must independently find that clear and convincing evidence supports the decision."); *In re A.B.,* 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15 ("[W]hether the evidence is sufficient to sustain the judgment is a question of law."), citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11. And clear and convincing evidence is " 'that measure or degree of proof which * * * will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Nonetheless, we accept the trial court's factual determinations if they are supported by "some competent and credible evidence." *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. Furthermore, in resolving Mother's challenge to the weight of the evidence, we consider "whether the [juvenile] court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed." *In re P/W Children*, 1st Dist. Hamilton No. C-200103, 2020-Ohio-3513, ¶ 27.

{¶9} R.C. 2151.414(B)(1) permits the juvenile court to amend temporary custody to permanent custody upon satisfaction of a two-prong test. *In re F.B.*, 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, ¶ 16; *In re S.G.*, 1st Dist. Hamilton No. C-200261, 2020-Ohio-5244, ¶ 31. To grant permanent custody, the court must find, by clear and convincing evidence: (1) that one of the preconditions in subsection (B)(1)(a) through (e) is satisfied; and (2) that it is in the child's best interest, considering all relevant factors, including the factors in subsection (D)(1). *See* R.C. 2151.414 (B)(1) and (D)(1); *In re F.B.* at ¶ 17–18.

{¶10} Mother concedes that HCJFS meets the first half of the test by establishing that "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * * ." R.C. 2151.414(B)(1)(d). HCJFS obtained temporary custody in May 2017, and the juvenile court granted permanent custody in September 2020, well past the 12-in-22 requirement.

{¶11} That brings us to the second prong: whether permanent custody is in J.M.'s best interest, considering all relevant factors, including the five factors in R.C. 2151.414(D)(1). The subsection (D)(1) factors include: (a) the child's relationship with parents, relatives, caregivers, and others; (b) the wishes of the child; (c) the child's custodial history; (d) the child's need for a secure placement; and (e) whether any additional factors in subsection (E)(7) to (11) (which pertain to the child's parents) apply. "In conducting the best-interest analysis 'no single factor is given greater weight or heightened significance.' " *In re F.B.* at ¶ 19, quoting *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35.

{¶12} The first factor requires the court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). Mother insists that visitation records confirm the closeness of her relationship with J.M.. She also features her compliance with her case plan and her progress on her anger management issues. But the court saw things differently. Rather than focusing on the volume of visits, the court looked at the substance, observing a lack of consistency and positivity during those visits (highlighting Mother's aggressive behavior to another child that we mentioned

6

above). Mother's reticence to tackle her anger management issues manifested itself in challenging encounters both with J.M. and others, which the court duly noted. At the same time, J.M. bonded with his foster parents, further bolstering the court's conclusion.

{¶13} The second factor explores "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). Here, as the court notes, while J.M. voiced a preference of reuniting with Mother, his guardian ad litem requested that the court award permanent custody to HCJFS, highlighting, among other things, J.M.'s serious medical conditions with which Mother seems not to want to engage. Mother does not really quibble with the court's conclusions here, but rather attacks the court for not holding an in-camera interview with J.M. But Mother points to no authority supporting her position. Instead, she cites *In re Walling*, 1st Dist. Hamilton No. C-050646, 2006-Ohio-810, where we held that where a child's wishes conflict with the guardian ad litem's, "the court should, at a minimum, conduct an in-camera [] interview * * * to determine whether independent counsel is needed." *Id.* at ¶ 24. But here, J.M. had independent counsel, resolving the concern expressed in *Walling*. And there is no evidence in the record that J.M.'s attorney requested the in-camera interview that Mother claims was lacking. We thus find her argument misguided.

{¶14} The third factor implicates the child's custodial history. R.C. 2151.414(D)(1)(c). Here, the court noted that J.M. had been in the custody of HCJFS for approximately 30 months and that he appeared to be thriving with his current foster family.

{¶15} The fourth factor asks the court to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). On this factor, the court reasoned that J.M.'s physical and psychological needs weighed heavily in favor of granting permanent custody to HCJFS. In particular, the court emphasized Mother's failure to identify the services that she would provide J.M., juxtaposing that against the view of J.M.'s caseworkers, who doubted Mother's ability to care for his needs. Mother's struggles with homelessness also factor into the inquiry here.

{¶16} The final factor addresses "[w]hether any of the [additional] factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(e). In many cases, this factor does not come into play in substantive fashion, but the court pointed to factor (E)(10) as relevant because J.M.'s father had abandoned him (we do not believe this directly implicates the inquiry regarding Mother, however).

{¶17} Based upon our review of the record and the court's analysis, we conclude that the juvenile court's conclusions were supported by both the weight and sufficiency of the evidence. The record provides clear and convincing evidence that granting permanent custody to HCJFS was in J.M.'s best interest. Nor can we say that the court lost its way in resolving evidentiary conflicts. We therefore overrule Mother's assignment of error as to J.M.

B.

{¶18} We measure weight and sufficiency challenges to a legal custody determination differently "[b]ecause an award of legal custody does not divest

8

parents of their residual parental rights, privileges, and responsibilities." *In re A.W.*, 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, ¶ 9. As a result, we review the court's decision for an abuse of discretion. *See In re D.Z.F.*, 1st Dist. Hamilton No. C-200260, 2020-Ohio-5246, ¶ 20 ("In reviewing a juvenile court's grant of legal custody, we apply an abuse-of-discretion standard * * * ."); *In re E.B.*, 1st Dist. Hamilton Nos. C-190050 and C-190054, 2019-Ohio-3943, ¶ 13 (clarifying that "in the legal custody context, abuse of discretion applies."). And "the trial court abuses its discretion when its best-interest determination is not supported by competent and credible evidence." *In re F.B.D.*, 1st Dist. Hamilton No. C-180356, 2019-Ohio-2562, ¶ 11; *see In re D.Z.F.* at ¶ 20.

{**¶19**} Much like permanent custody cases, R.C. 2151.415(A) provides that an agency with temporary custody of a child may ask the court to grant legal custody to another person. But unlike permanent custody proceedings, the statutory scheme provides little guidance for the court in granting or denying legal custody. *In re F.B.D.* at ¶ 12. Stepping into the statutory gap, Ohio courts agree that if a child has already been adjudicated abused, neglected, or dependent under R.C. 2151.353, legal custody must be determined according to the best interest of the child. *In re A.W.*, 1st Dist. Hamilton No. C-140142, 2015-Ohio-489, ¶ 8 ("When a child has been adjudicated abused, neglected, or dependent * * * * the juvenile court's focus is on the best interests of the child."); *In re Z.*, 1st Dist. Hamilton No. C-190026, 2019-Ohio-1617, ¶ 29 (same). We have also explained that, for guidance, courts are permitted to use R.C. 2151.414(D)(1) (the permanent custody factors discussed above) or R.C. 3109.04(F) (factors used for private custody disputes). *See In re E.R.M.,* 1st Dist. Hamilton No. C-190391, 2020-Ohio-2806, ¶ 16 (noting that we have

9

"previously turned to the best interest factors articulated in both R.C. 2151.414(D), governing permanent custody cases, and R.C. 3109.04(F), controlling private custody matters in domestic relations courts."), citing *In re F.B.D.* at ¶ 12 (noting several cases where this court held "the best-interest factors set forth in R.C. 2151.414(D) are instructive" and that "the court may [also] consider the factors in R.C. 3109.04(F)."). Here, the court assessed the best-interest factors in R.C. 2151.414(D)(1).

{¶20} Regarding the first factor—C.E.'s relationship with parents, relatives, and others—the court explained that C.E. had lived with her aunt and uncle for about a year and that she is well-adjusted. The aunt stays at home with her children, providing a secure environment, and C.E. gets along well with the other children. C.E. is also doing well in school and keeping up with therapy. On the other side of the balance, C.E.'s visits with Mother are anxiety-provoking affairs, which C.E. must often grapple with long after the visits conclude.

{¶21} For the second factor—C.E.'s wishes—C.E. asked to remain with her aunt and uncle, and she does not want further visitation with Mother. C.E.'s guardian ad litem similarly recommended that custody be given to her aunt and uncle for many of the reasons chronicled above. And as to the third factor—C.E.'s custodial history—the court found that this factor weighed in favor of legal custody in light of C.E.'s history with HCJFS (since October 2016) and with her aunt and uncle (since March 2019).

{¶22} Regarding the fourth factor—CE's need for a secure placement—the evidence similarly supported the court's decision. Mother's intermittent homelessness and C.E.'s previous anxiety over having food and shelter weigh in favor

of giving legal custody to her aunt and uncle.  And for the fifth and final factor—whether subsection (E)(7) to (11) applies—similar as with J.M., the court seized on C.E.'s father's abandonment of her.

{¶23} Based on our review of the record, we conclude that the court's determinations were based on competent and credible evidence.  We cannot say that the court abused its discretion in granting legal custody of C.E. to her aunt and uncle and we also overrule Mother's assignment of error as to C.E.

\* \* \*

{¶24} In light of the foregoing analysis, we overrule Mother's sole assignment of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion

11