[Cite as *In re J.S.*, 2024-Ohio-4887.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: J.S. AND F.W.  :   APPEAL NO. C-240116
            TRIAL NO. F21-127X

           :

           :   *O P I N I O N.*


Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: October 9, 2024


*Adams Law, PLLC*, and *Aaren E. Meehan*, for Appellant Mother,

*Michael D. Eagen*, for Appellee Guardian Ad Litem for the Minor Children,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Thomas Koopman*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**ZAYAS, Judge.**

{¶1} Appellant mother appeals the judgment of the Hamilton County Juvenile Court awarding legal custody of J.S. and F.W. to maternal grandparents. For the reasons that follow, we affirm the judgment of the juvenile court.

## I. Background

{¶2} In February 2021, the Hamilton County Department of Job and Family Services ("HCJFS") filed a complaint for temporary custody of J.S. and F.W., asserting that the children were dependent due to ongoing domestic violence between mother and J.S.'s father. The children were ultimately adjudicated dependent on March 24, 2021, and HCJFS was granted temporary custody of the children on July 14, 2021. Of relevance, the case plan required mother to complete domestic-violence and mental-health assessments and engage in all recommended services.

{¶3} On December 4, 2021, HCJFS filed a motion for an extension of temporary custody, indicating that mother was making progress on the case plan. After the hearing on this initial extension motion was continued twice, at what appears to have been mother's request, HCJFS filed another motion for a second extension of temporary custody on May 27, 2022, again indicating that mother was making progress on the case plan. On June 14, 2022, the juvenile court granted both extensions after a hearing, resulting in an extension of temporary custody until February 9, 2023.

{¶4} On December 19, 2022, HCJFS filed a motion to terminate temporary custody and award legal custody to maternal grandparents. The motion alleged that the children had been out of mother's care since February 2021 and mother was not able to offer the children the "environment necessary at this time." The motion further alleged that maternal grandparents expressed an interest in providing a permanent

placement for the children and that legal custody to them was in the best interest of the children.

{¶5} Hearings were held in front of the magistrate on HCJFS's motion on June 8 and September 27, 2023. The HCJFS caseworker testified in support of the motion and said that the agency was pursuing legal custody to maternal grandparents. The caseworker explained that, although mother had engaged in all case-plan services and initially showed insight into the domestic-violence issues, the agency believed that the initial insight did not last as mother had contact with J.S.'s father between December 2022 and April 2023, through over 200 phone calls, and the agency believed that mother would remain in contact with him as she did not see any issue with the contact and did not recognize the dangers involved in continuing a relationship with him. Mother testified in opposition to the motion. She said that she discussed domestic violence in therapy and learned the "red flags" to pay attention to and learned that people can "put up those fake personas." She denied having a relationship with J.S.'s father and denied having any contact with him since May when the phone calls between them were discovered. She said she was communicating with J.S.'s father at that time for closure and to let him know that she forgave him. She denied any intent to get back together with him. Maternal grandmother also testified. She said that mother made positive changes in her life in the past year but said she preferred not to answer whether she believed that mother was "stable." She denied any fears or concerns "as of now" for the children while they are in mother's care and said that she heard from "other grandma" that there is no longer a relationship between mother and J.S.'s father.

{¶6} On October 5, 2023, the magistrate entered an order terminating custody to HCJFS and awarding legal custody to maternal grandparents. The entry

3

recognized mother's active participation with the children and with services, but also recognized that mother had still been in significant contact (over 80 hours) with J.S.'s father while he was incarcerated and mother did not see an issue with this contact or disclose this contact to her therapist, which undermined her testimony that she was only communicating with him for closure and to forgive him and move on.[1] The entry also suggested that this extensive contact undermined mother's testimony that she did not want to be in a relationship with J.S.'s father. The magistrate said that this, combined with mother admitting that J.S.'s father wanted to be in a relationship with her and the fact that J.S.'s father denied in his diagnostic assessment that he hurt mother and did not engage in any services, showed that the children would be at risk in mother's custody. The magistrate further found that the children needed to be in a legally secure placement, as the amount of time they have spent in HCJFS's custody "far exceeds the reasonable amount of time," and legal custody to the maternal grandparents was in the children's best interest. However, the magistrate ordered that mother "shall have liberal unsupervised parenting time with the children."

{¶7} Mother filed objections to the magistrate's decision, arguing that an award of legal custody to the grandparents was not in the best interest of the children and asserting that the magistrate failed to adequately consider the best-interest factors. In essence, the objections asserted that mother's testimony refuted the magistrate's findings regarding her relationship with J.S.'s father, argued that there was no evidence to support that an award of custody to mother would be detrimental to the children, and argued that the evidence shows that the magistrate's best-interest

---

[1] We note that, as discussed later in the opinion, mother's actual testimony was that she could not remember whether she told her therapist about the communication with J.S.'s father.

determination was not supported by the evidence due to health concerns of the grandparents.

{¶8} On January 29, 2024, the juvenile court overruled the objections and approved and adopted the magistrate's decision as supplemented by the court. The court said that it was not rewriting a separate analysis; rather, it was supplementing the magistrate's decision "to address the appropriate statutory factors." After weighing the factors set forth in R.C. 2151.414(D), the court found that the magistrate correctly determined that an award of legal custody to maternal grandparents was in the children's best interest.

{¶9} Mother now appeals. In a single assignment of error, she argues that the trial court abused its discretion in finding that an award of legal custody to maternal grandparents was in the children's best interest.

## II. Best Interest

{¶10} R.C. 2151.415(D)(3) requires that, prior to the expiration of the second extension of temporary custody, the agency with custody of the child must file a motion with the court requesting the issuance of one of the orders of disposition under R.C. 2151.415(A)(1) to (5). In this case, HCJFS filed a motion for the children to be placed in the legal custody of maternal grandparents under R.C. 2151.415(A)(3).

{¶11} Legal-custody determinations under R.C. 2151.415(A)(3) must be made according to the best interest of the child. *See* R.C. 2151.415(B); R.C. 2151.42(A); *In re M/E*, 2021-Ohio-450, ¶ 19 (1st Dist.), citing *In re A.W.*, 2015-Ohio-489, ¶ 8 (1st Dist.); *In re K.V.*, 2012-Ohio-190, ¶ 19 (6th Dist.), citing R.C. 2151.415(B) and *In re Katelynn M.*, 2008-Ohio-5296, ¶ 9 (6th Dist.). In determining the best interest of the child, this court has held that, although the statute itself does not list factors that should be

5

considered when making a legal-custody determination, a juvenile court may look to the factors in R.C. 2151.414(D)(1) or 3109.04(F) for guidance. *In re M/E* at ¶ 19.

{¶12} Mother, in essence, presents weight and sufficiency challenges, arguing that the evidence does not show that an award of custody to maternal grandparents was in the children's best interest.

{¶13} "Juvenile courts are afforded broad discretion in fashioning a disposition following the adjudication of a child as being abused, neglected, or dependent, because the courts are charged with protecting the best interest of the children." *In re R.G.M.*, 2024-Ohio-2737, ¶ 16, citing R.C. 2151.353(A). By granting legal custody of the children to the maternal grandparents, the juvenile court awarded them, "'the right to have physical care and control of the children,'" but mother "retained her 'residual parental rights, privileges, and responsibilities'" and "may in the future seek to modify or terminate the legal-custody order." *Id.*, citing R.C. 2151.011(B)(21) and 2151.42(B).

{¶14} Because an award of legal custody under R.C. 2151.415(A)(3) does not divest parents of their residual rights, privileges, and responsibilities, this court's standard of review for weight and sufficiency challenges differs from that used for permanent-custody cases. *In re M/E*, 2021-Ohio-450, at ¶ 8, 18 (1st Dist.). Unlike permanent-custody decisions where we independently review the evidence to determine whether clear and convincing evidence supports the court's decision, we review the juvenile court's decision to grant legal custody to a relative for an abuse of discretion. *Id.* at ¶ 18, citing *In re D.Z.F.*, 2020-Ohio-5246, ¶ 20 (1st Dist.). "An abuse of discretion connotes that the trial court's attitude was arbitrary, unreasonable, or unconscionable." *In re J.T.*, 2020-Ohio-4246, ¶ 21 (6th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An abuse of discretion occurs when the

juvenile court's best-interest determinations are not supported by competent and credible evidence. *In re M/E* at ¶ 18, citing *In re F.B.D.*, 2019-Ohio-2562, ¶ 11 (1st Dist.), and *In re D.Z.F.* at ¶ 21.

**{¶15}** In making the decision to award legal custody to maternal grandparents, the juvenile court relied on—among other things—the best-interest factors in R.C. 2151.414(D)(1), which include, but are not limited, to:

(1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period;

(4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.

R.C. 2151.414(D)(1).

### A. The Interaction and Interrelationship of the Children with Mother, Maternal Grandparents, and Others

**{¶16}** The juvenile court found that the children are extremely bonded to each other and to maternal grandparents, noting that J.S. follows maternal grandfather everywhere. The juvenile court also found that mother's visits go well, and she is bonded with the children.

**{¶17}** Mother does not appear to dispute the juvenile court's findings, instead arguing that a grandparent's bond with his or her grandchildren does not outweigh a parent's bond. However, there is no indication that the juvenile court weighed this factor in favor of the grandparents. Rather, the juvenile court's decision indicates that it found this factor favorable to both parties, and, based on the evidence in the record, we cannot say that the trial court's findings were not supported by competent and credible evidence in the record.

### B. The Wishes of the Children

**{¶18}** The juvenile court found that, due to age and maturity (ages 7 and 3), the wishes of the children were not made clear. However, the court noted that the guardian ad litem ("GAL") opined that awarding legal custody to maternal grandparents was in the children's best interest.

**{¶19}** Mother also does not appear to dispute this finding, instead asserting that the court cannot replace the children's wishes with the GAL's recommendation. However, this argument fails as courts, including this one, have held that it is proper for the juvenile court to consider the GAL's recommendation under this factor where the children are too young to express their wishes. *See, e.g., In re B/K Children*, 2020-Ohio-1095, ¶ 45 (1st Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 60; *In re I.N.*, 2024-Ohio-950, ¶ 50 (8th Dist.). Consequently, it was not error for the court to consider the GAL's recommendation under this factor.

### C. The Custodial History of the Children

**{¶20}** The juvenile court found that the children have been in the custody of HCJFS and care of maternal grandparents since February 2021. This finding is supported by the record as the children were placed in the interim custody of HCJFS on February 10, 2021.

**{¶21}** Mother does not appear to dispute this finding, instead asserting that the custodial history is "distorted" where mother went six months without visitation with the children due to grandfather's "unfounded" allegations in the criminal case against her.

**{¶22}** However, we fail to see how mother's visitation history would undermine the juvenile court's finding on the custodial history of the children in this case as, even if mother would have been allowed visitation during the pendency of her criminal case, there is nothing in the record to indicate that the children would not have nevertheless remained in the custody of HCJFS at that time since visitation was never the issue in this case. Consequently, we see no error in the trial court's finding as to the custodial history of the children in this case.

### D. The Children's Need for a Legally Secure Placement

**{¶23}** The juvenile court found that the children needed a legally secure placement as concerns for the potential risk of harm to the children remained if they were to be placed with mother. The court said that it remained concerned regarding mother's appreciation of the harm that could result to the children if she is in a relationship that involves domestic violence. The court said that mother's consistency in therapy and affirmation that she would not engage in a relationship with J.S.'s father was commendable, but also found that this did not eradicate the concern where the other evidence showed that there were at least four known incidents of domestic violence between mother and J.S.'s father—the most severe of which was in December 2021 and involved physical violence and the use of a firearm—and yet mother maintained "repeated and extensive contact" with J.S.'s father while he was incarcerated for the last domestic-violence incident, and did not disclose this contact to her therapist.

9

**{¶24}** Conversely, the court found that the children have been secure in their placement with maternal grandparents where the record shows that HCJFS believes that the children are provided a happy and safe environment with them, the children regularly attend "TIP" for therapy services, the children are up to date on their medical care and attend their doctor's appointments, and F.W. is doing well in school, and there are no reports that show any negative or unsafe treatment to the children while in their care.

**{¶25}** Mother disputes the juvenile court's finding that she cannot provide a legally secure placement and argues that the evidence shows that she can provide a legally secure placement for the children where she successfully completed all case-plan services and was forthcoming regarding her contact with J.S.'s father and does not dispute that they spoke from December 2022 to April 2023. She points to her testimony that she was only communicating with J.S.'s father for "forgiveness and closure," and would not engage in a relationship with him or anyone like him.

**{¶26}** The record does reflect that mother engaged in all case-plan services. However, case-plan compliance is not dispositive in a legal-custody determination as the focus is on the best interest of the child at the dispositional stage. *See In re Z.C.*, 2023-Ohio-963, ¶ 38 (2d Dist.), citing *In re A.K.*, 2017-Ohio-8100, ¶ 11 (2d Dist.).

**{¶27}** Further, while mother did testify that she would not engage in a relationship with J.S.'s father, we recognize that the trier of fact was in the best position to determine mother's credibility and the weight of this testimony. *See, e.g., In re R.A.D.*, 2021-Ohio-372, ¶ 52 (1st Dist.), quoting *In re A.F.*, 2020-Ohio-5069, ¶ 35 (1st Dist.) (recognizing that, in legal-custody cases, "[a]n appellate court must defer to the trial court's findings 'regarding the weight to be given to any evidence because the trial court was in the best position to make that determination.'").

{¶28} HCJFS submitted evidence showing that J.S.'s father—who, at the time of the hearing, was scheduled to soon complete his sentence of incarceration—made over 270 phone calls from the London Correctional Facility to a number that mother admitted was hers between December 12, 2022, and April 1, 2023. In other words, mother was communicating with J.S.'s father until the month prior to the first hearing on the legal-custody motion. Mother did not dispute these phone calls, nor negate the testimony of the HCJFS caseworker that mother did not see any issue with the contact with J.S.'s father. Additionally, when asked whether she discussed this contact with her therapist, mother testified that she could not remember whether she did. Beyond that, mother offered very limited testimony into her insight of the domestic-violence concern, and the juvenile court was in the best position to weigh this testimony against the testimony of the HCJFS caseworker who said that mother did not recognize the dangers involved in continuing a relationship with him.

{¶29} Based on the evidence in the record, this court cannot say that the juvenile court's finding that mother could not provide a legally secure placement was not supported by competent and credible evidence in the record.

### E. Other Allegedly Relevant Factors

{¶30} Mother argues that there are health concerns pertaining to maternal grandmother that should have been considered by the court since maternal grandfather works 55-60 hours a week. However, there is no indication that the court did not consider all the evidence presented, and the testimony regarding grandmother's health issues only established issues with transportation as grandmother cannot drive long distances. There was no evidence presented that grandmother cannot care for the children.

**{¶31}** Mother also argues that the relationship between her and maternal grandfather should have been considered, and yet the domestic violence committed by maternal grandfather was ignored by the juvenile court. When asked to talk about the domestic violence she experienced as a teenager, Mother testified:

It was incidents where my dad just used to – randomly he was upset, he would pull my hair. There have been times where he literally just physically assaulted me for no reason. Even within the last past year he physically assaulted me for no reason. (Crying.)

**{¶32}** Nevertheless, this testimony was the only evidence of any domestic violence allegedly committed by grandfather and the trier of fact was in the best position to determine the weight of this testimony. *See, e.g., In re R.A.D.*, 2021-Ohio-372, at ¶ 52 (1st Dist.).

### III. Due Process

**{¶33}** The dissent would have this court reverse the juvenile court's decision on due-process grounds. We are not unsympathetic to the concerns raised by the dissent and could agree that the policy concerns raised may warrant questioning—in the appropriate case—the removal of children by HCJFS based on allegations that the children were exposed to domestic violence. Nevertheless, based on the limited arguments presented by mother, the record before us, and the stage of the proceedings below in this case, we cannot conclude that this is the appropriate case in which to address these concerns.

**{¶34}** First, the arguments presented to this court on appeal are limited to weight and sufficiency challenges. Mother does not, in any meaningful way, raise any sort of argument in the realm of a due-process challenge. In fact, the phrase "due process" does not appear anywhere in her brief to this court. Further, mother did not

raise any due-process argument to the trial court in her objections to the magistrate's decision. Consequently, this issue has not been appropriately briefed by any party at any point in the proceedings. In such a situation, this court should not be crafting arguments for a party on appeal. *See generally, e.g., In re J.G.S.*, 2019-Ohio-802, ¶ 31 (1st Dist.) ("To be considered on appeal, errors by a trial court must be separately argued and supported by legal authority and citation to the record. . . . 'If an argument exists that can support [an] assignment of error, it not this court's duty to root it out.'" (Citations omitted.)). It is the appellant's burden to demonstrate error on appeal, and this court should not relieve an appellant of this burden by forming an argument for her, as tempting as it may be. *See generally, e.g., In re R/G Children*, 2021-Ohio-839, ¶ 20 (1st Dist.), citing App.R. 9 and 16(A)(7) ("The burden of affirmatively demonstrating error on appeal rests with the appellant.").

{¶35} Second, the record before us is limited to the evidence that was presented at the ultimate R.C. 2151.415(D)(3) hearing, which—appropriately— occurred just prior to the expiration of the second (and final) extension of the award of temporary custody of the children to HCJFS. Consequently, as the dissent acknowledges, our record does not include any evidence of what occurred at the adjudication or initial disposition proceedings in this case, as it is devoid of the transcripts of those proceedings.

{¶36} Despite this, the dissent points to a New York line of cases to suggest that mother's substantive due-process rights were violated by the children's removal in this case. In those cases, the New York Court of Appeals (New York's highest court), in response to questions certified to it by the Second Circuit Court of Appeals, analyzed New York law and held that, based on New York's statutory definition of a neglected child, a family court cannot find a parent "responsible for neglect based on two facts

13

only: that the parent has been the victim of domestic violence, and that the child has been exposed to that violence." *Nicholson v. Scoppetta*, 3 N.Y.3d 357, 368 (N.Y. 2004) ("*Nicholson III*"). Notably, the court said that reaching an opposite conclusion would "read an unacceptable presumption into the statute, contrary to its plain language." *Id.*

{¶37} In reaching this conclusion, the court looked to the statutory definition of a "neglected child" under New York law and said that a party seeking to establish neglect in New York must show (1) that a child's physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired, and (2) that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship. *Id.* The court specifically noted that the drafters of New York's Family Court Act "were 'deeply concerned' that an imprecise definition of child neglect might result in 'unwarranted state intervention into private family life.'" *Id.* The court went on to more specifically analyze the requirements for a finding of neglect under New York law and ultimately said that, where a mother is a victim of domestic violence, the inquiry as to whether she failed to excise a minimum degree of care in providing for her child in such a circumstance must be focused on "whether she has met the standard of the reasonable and prudent person in similar circumstances." *Id.* at 370-371. In other words, the inquiry "is dependent on facts such as the severity and frequency of the violence, and the resources and options available to the mother." *Id.* at 371. Consequently, the court held that where the "sole allegation" is that the mother has been abused and the child witnessed the abuse, the burden is not met to show neglect under New York law. *Id.*

**{¶38}** The court's holding in *Nicholson III* ameliorated the broad due-process concerns of the federal courts in the *Nicholson* line of cases as the *Nicholson III* decision confirmed that New York law did not allow for a "blanket presumption" in favor of removal of children who have witnessed domestic violence. *See Nicholson v. Scoppetta*, 344 F.3d 154, 174 (2d Cir. 2003) ("*Nicholson II*"); *Nicholson v. Scoppetta*, 116 Fed.Appx. 313, 315 (2d Cir. 2004) ("*Nicholson IV*"). Therefore, the Second Circuit vacated and remanded the district court's initial decision on the constitutional concerns raised by such a situation in *Nicholson v. Williams*, 203 F.Supp.2d 153 (E.D.N.Y. 2003) ("*Nicholson I*"), and remanded the matter back to the district court for reconsideration based on the trial record and the opinion of the New York Court of Appeals in *Nicholson III*. *Nicholson IV* at 315.

**{¶39}** In this case, the removal of the children was based on an initial assertion and ultimate finding of dependency, rather than neglect. A "dependent child" is defined in Ohio to include "any child * * * [w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2151.04(C). Notably, an adjudication of dependency under this section does not focus on the fault of the parent. *See In re K.K.*, 2024-Ohio-2595, ¶ 34 (12th Dist.), quoting *In re A.V.*, 2021-Ohio-3873, ¶ 22 (12th Dist.), and *In re M.W.*, 2021-Ohio-1129, ¶ 13 (12th Dist.). Rather, the determination focuses on the child's condition or environment. *Id.* Thus, "[a] finding of dependency under R.C. 2151.04(C) requires evidence of 'conditions or environmental elements adverse to the normal development of the child.'" *Id.*, quoting *M.W.* at ¶ 13. In other words, Ohio law would not permit a blanket presumption of dependency where the sole allegation is that the child has witnessed domestic violence as such an allegation, without more, does not prove that a child's environment is adverse to his or her normal development.

15

**{¶40}** Further, in adjudicating a child dependent under R.C. 2151.04(C), the juvenile court must enter written findings of fact and conclusions of law into the record of the case and include "specific findings as to the existence of any danger to the child and any underlying family problems that are the basis for the court's determination that the child is a dependent child." R.C. 2151.28(L). Thus, a dependency finding requires that the juvenile court make specific findings as to the basis of its determination that the child is dependent so that such a determination can be subject to meaningful review. *See In re C.M.*, 2024-Ohio-2713, ¶ 6 (8th Dist.). Consequently, the juvenile court is not permitted to make "boilerplate" findings that are lacking in detail and not specific to the case before it. *See id.*

**{¶41}** However, in the case before us, we are restricted in our ability to review what occurred at the adjudication and initial disposition phase of the proceedings below as the record does not contain any transcripts of those proceedings. Consequently, we do not know what evidence was presented to the juvenile court at the adjudicatory hearing or even the initial disposition hearing. To further compound the issue, the record does not contain any written findings of fact from the juvenile court in accordance with R.C. 2151.28(L). Normally, this error alone would result in a remand to the juvenile court to enter such findings. *See, e.g., id.* at ¶ 9. However, mother did not timely appeal from the juvenile court's initial disposition granting temporary custody of the children to HCJFS.

**{¶42}** "'[A]n adjudication that a child is neglected or dependent, followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a "final order" for purposes of R.C. 2505.02 and is appealable to the court of appeals pursuant to R.C. 2501.02.'" *In re K.K.*, 2022-Ohio-3888, ¶ 58, citing *In re Murray*, 52 Ohio St.3d 155, 161 (1990). Consequently, "'an

16

appeal of an adjudication order of abuse, dependency, or neglect of a child and the award of temporary custody to a children services agency pursuant to R.C. 2151.353(A)(2) must be filed within 30 days of the judgment entry pursuant to App.R. 4(A)." *Id.*, citing *In re H.F.*, 2008-Ohio-6810, ¶ 18. "'Res judicata bars relitigation of a matter that was raised or could have been raised on direct appeal when a final, appealable order was issued in accordance with the law at the time.'" *Id.* at ¶ 60, quoting *State v. Griffin*, 2013-Ohio-5481, ¶ 3.

**{¶43}** Because mother did not timely file an appeal from the juvenile court's July 2021 decision granting temporary custody of the children to HCJFS after the children were adjudicated dependent, res judicata bars relitigation of any issues that could have been raised in that direct appeal, including issues related to the dependency finding. Therefore, we cannot address the juvenile court's failure to follow R.C. 2151.28(L) at this point in the proceedings, nor can we consider in this appeal whether the adjudication was appropriate.

**{¶44}** Rather, the issue presented to this court is simply whether the juvenile court acted within its discretion in making its best-interest determination upon consideration of the ultimate, appropriate disposition under R.C. 2151.415 just prior to the expiration of the *final extension* of temporary custody that is permissible under Ohio law. *See* R.C. 2151.415(D)(3) and (4).

**{¶45}** At this final stage in the proceedings, the sole focus is the best interest of the children. *See generally, e.g., In re L.N.*, 2024-Ohio-2571, ¶ 40 (6th Dist.). Thus, the juvenile court's role in the proceedings in question before us was limited to determining, based on the evidence presented, what ultimate disposition was in the best interest of the children. The record reflects that this is exactly what the juvenile court did and, as already explained above, it did so within the bounds of the discretion

that it was granted under Ohio law. Consequently, we cannot hold that the juvenile court abused its discretion in this case, even if we might think the result should have been different. Beyond that, for the reasons explained, we do not see this as the appropriate case to address the dissent's due-process concerns regarding the manner in which HCJFS is prosecuting these types of cases given the limited arguments presented by mother in this case, the record before us, and the stage of the proceedings below.

## IV. Conclusion

{¶46} The juvenile court's best-interest determination was supported by competent and credible evidence in the record, and we cannot say that the juvenile court's decision was arbitrary, unreasonable, or unconscionable. Consequently, this court cannot say that the juvenile court abused its discretion when awarding legal custody to maternal grandparents. Therefore, we overrule the assignment of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**BOCK, P.J.,** concurs.
**KINSLEY, J.,** dissents.

**KINSLEY, J.,** dissenting.

{¶47} J.S. and F.W. lost the opportunity to be raised by their mother—a mother who undoubtedly loves them, has provided for them in tangible ways, and would protect them at all costs—in large part because she was a victim of domestic violence. On the record before us, this outcome is not in J.S.'s and F.W.'s best interests, and the juvenile court's finding to the contrary was therefore an abuse of discretion.

**{¶48}** In general, the practice of punishing parents who are victims of domestic violence with the loss of their children not only falls outside what is permitted by Ohio's dependency statutes, but it is also potentially unconstitutional. In addition, the practice is in tension with the panoply of protections for crime victims afforded by Marsy's Law and embodies dangerous policy determinations that both jeopardize the wellbeing of vulnerable children and embolden abusers. Specific to this case, mother's loss of custody was also supported by very little credible evidence outside the speculative opinion of a nonexpert HCJFS caseworker that removing J.S. and F.W. from their mother's custody was in their best interests. For these reasons, I dissent.

### *Factual and Procedural Background*

**{¶49}** J.S. and F.W. were originally removed from their mother's care based on reports that J.S.'s father was abusing mother. The juvenile court determined that J.S. and F.W. were dependent on March 24, 2021, and placed them in the temporary custody of their maternal grandparents. More than two-and-a-half years later, on October 5, 2023, the juvenile court entered its disposition on this finding and removed J.S. and F.W. from their mother's legal custody.

**{¶50}** The reasons for this long delay in determining the appropriate outcome for J.S.'s and F.W.'s dependency are not abundantly clear in the record, although a number of status reports during the period of time between adjudication and disposition suggest that mother was making progress on her case plan. Also unclear from the record is the precise basis for the juvenile court's dependency finding. While testimony at the dispositional hearings referenced a concern that the children would witness domestic violence, we lack transcripts of the dependency hearings themselves to verify what actually took place.

{¶51} R.C. 2151.415(B) directs that a disposition following the termination of temporary custody focus on what is in the best interest of the child. But the overwhelming tenor of the dispositional hearings in J.S. and F.W.'s case focused on mother and her response to incidents of domestic violence that had occurred years in the past rather than on information about J.S. and F.W. themselves.

{¶52} The most serious of the violent acts perpetrated by J.S.'s father against mother took place in December of 2021. Neither of the children were present at the time. As described by mother, she had been at a friend's house, and J.S.'s father followed her home, about a ten-minute drive away. When she pulled into the driveway, she felt nervous about him confronting her, because they had had a hostile conversation earlier that day. She sat in her car for two or three minutes contemplating her options: rush to the house and try to beat him inside or remain in the car and risk him attacking there. She chose the former.

{¶53} But she dropped her keys before making it into the house, and J.S.'s father confronted her. She told him to leave, but he wouldn't back away. She asked again, but he kept coming towards her so, she fired a warning shot with a gun she kept for protection. Undeterred, he then followed her inside the house. He retrieved her gun and pointed it at her head, ultimately pistol-whipping her multiple times in the head until she blacked out. When she woke up, there was blood all across her bed, and her phone was laying in a pool of blood. She picked it up to call 9-1-1, but J.S.'s father wrestled the phone away from her.

{¶54} As she came to, J.S.'s father began cleaning blood from the baseboards, and mother was able to escape from the home. She drove to a nearby filling station to call the police, with J.S.'s father following closely behind her. According to mother, she felt as if she might have died that night had she not escaped and called for help.

**{¶55}** With mother's cooperation, J.S.'s father was prosecuted for this incident, convicted of a serious felony, and ultimately sentenced to several years in prison. Inexplicably, the record contains no indication that J.S.'s father was the subject of any proceeding filed by HCJFS to prohibit him from spending time with J.S. To the contrary, the caseworker testified that if J.S.'s father were not in prison, it would seek to engage services for him to be able to visit his child.[2]

**{¶56}** The dispositional hearings focused heavily on mother's response to this incident in the two-plus years since it had occurred. For example, the assistant prosecuting attorney representing HCJFS required mother to describe in great detail that event, even though she expressed reluctance to do so. The prosecuting attorney never explained the relevance of mother's testimony about what J.S.'s father did to the disposition and to the children's best interests. But what is clear from the transcript is that forcing mother to relive the events of December 2021 on the stand was retraumatizing to her. While recounting the assault, mother was crying and needed to take a break. Later in her testimony, she relayed that she was still shaking from having to revisit the incident.

**{¶57}** The record contains other indications that mother lives with lasting trauma and fear. For one, the HCJFS caseworker reported that mother was initially hesitant to attend court hearings in the criminal prosecution of J.S.'s father. Mother had expressed to the caseworker early on that J.S.'s father was extremely violent, so her fear of him was not unwarranted. But over time, mother began attending court and ultimately did participate as the victim in J.S.'s father's criminal case. Her anxiety around court proceedings nonetheless continued. According to the HCJFS

---

[2] The evidence revealed that J.S.'s father could not engage with these services while incarcerated.

caseworker, mother had to leave the courtroom on occasion during this proceeding. The caseworker hypothesized that mother would experience a trigger in the courtroom and would briefly step out as a way to manage her emotions.[3]

**{¶58}** Despite these clear indications that mother recognized the severity of the violence she survived, the HCJFS caseworker testified to her impressions of mother's insight and mindset. Critical to the weight of this testimony was the fact that the caseworker had only been working with mother's family for less than a year at the time of the first dispositional hearing and had not observed any interactions between mother and her children. The caseworker was therefore not in a position to testify as to the bond between mother and J.S. and F.W., nor could she offer a first-hand account of mother's demeanor over the full two-and-a-half-year period since the December 2021 pistol-whipping incident.

**{¶59}** Nevertheless, at the June 8, 2023 dispositional hearing, the caseworker relayed that mother had initially made progress in terms of acknowledging J.S.'s father's violent behavior but had not followed through. She said that mother had initially engaged in unidentified "behavioral changes" and "seemed to be doing very well." She also said that mother "didn't love [J.S.'s father] anymore." But the caseworker also testified, in speculative terms, that "it doesn't seem that the [changes] have lasted," without explaining further.

**{¶60}** At the September 27, 2023 hearing, the caseworker offered additional details about the "behavioral changes" expected of mother. She indicated she had

---

[3] These reactions to legal proceedings—fear, anxiety, a need for breaks—are not uncommon among survivors of intimate partner violence. *See*, *e.g.,* Eric M. Werner, *Notes & Comment: Avoiding the Second Assault: A Guidebook for Trauma-Informed Prosecutors*, 25 Lewis & Clark L.Rev. 573 (2021).

spoken to mother after the previous hearing to explain that HCJFS expected mother to stay in the hearings without taking breaks. The caseworker also testified that the children had spent two nights overnight with mother since the last hearing and that, while concerning to her, no one had reported any problems as a result of these visits.

**{¶61}** The caseworker also explained that J.S.'s father would work through the agency to establish visitation after receiving services upon his release from prison. For this reason, the caseworker felt that mother's contact with J.S.'s father while he was in prison put the children in danger. In sum, the caseworker testified that "[mother] doesn't feel as though [J.S.'s father] is a concern anymore, and that's where our concern is."

**{¶62}** Evidence presented at the dispositional hearings revealed that mother had been consistently engaged with individual therapy for a period of three-and-a-half years, as well as family therapy with both of her children. Mother testified that these therapeutic services have helped her to "pay attention to the red flags" and to address domestic violence she experienced both as a teenager and later in her adult life.

**{¶63}** The caseworker indicated she had not been able to get in contact with mother's therapist and did not have an update as to her progress. Thus, the caseworker's testimony about what mother's status should have been and how mother should have handled the trauma she endured was entirely speculative. This perhaps explains why the caseworker's testimony was worded so vaguely: "it doesn't seem" mother's "behavioral changes" have lasted.

**{¶64}** With regard to the children's placement with their maternal grandparents, the caseworker indicated she had discussed the potential of having J.S.'s father visit J.S. and K.W.'s father visit K.W. Maternal grandmother was amenable to those visits provided they occurred safely. The caseworker also indicated

23

that she had spoken with J.S.'s father about his intentions with regard to visiting J.S. and with regard to the services HCJFS could offer. The caseworker did not explain why she faulted mother for discussing the possibility of coparenting with J.S.'s father when HCJFS was doing the exact same thing.

{¶65} Maternal grandmother testified at the September 27, 2023 dispositional hearing. When asked about J.S.'s father, she responded, "I don't know what to say, I've heard numerous of things [sic] . . . I don't know what is true, I don't know what is fact, but I got the baby, that's a fact."

{¶66} Maternal grandmother also discussed health issues that impacted her daily functioning. She indicated that she had suffered a stroke that left her paralyzed on one side of her body. The caseworker also testified that maternal grandmother needed assistance with transporting the children to appointments as a result of this condition.

{¶67} Mother also testified at the September 27, 2023 dispositional hearing. She explained that she accepted calls from J.S.'s father while he was in prison for closure and for the purpose of expressing forgiveness. She indicated that she would never forget what he did to her, but felt a calling from God to forgive. She testified that she would never want to be in a relationship with J.S.'s father again and expressed that she could have lost her life due to his violence. When asked why she would not want to be with J.S.'s father, she said "the mental, the physical, the verbal, just everything in general. I would never want to go through that or let alone let my kids go through that again."

{¶68} Mother also testified that her own father had physically abused her when she was a child. She indicated that he would pull her hair and push her. She

explained that the physical aggression continued even through adulthood. She was crying as she told the juvenile court about her father's abuse.

{¶69} The record does not reflect that HCJFS investigated mother's claims regarding her father, nor does it contain any evidence that maternal grandfather was even questioned about the allegations. Instead, HCJFS continued to recommend that J.S. and F.W. reside in the home with maternal grandfather even after mother revealed that her father had physically abused her. Maternal grandfather was not present for the dispositional hearings and did not testify.

{¶70} Mother also offered testimony as to her then-current life status. She indicated that she was currently in a new relationship that was violence-free. She worked for a hospice healthcare agency as an aide and provided private care to individuals, as well as performing hair services on the side. She had saved up a month of paid time off to care for her children were they to return to her care. She routinely bought her children clothes and gave money to maternal grandmother to provide for their needs. She also attended biweekly therapy appointments and other medical appointments with her children.

{¶71} Following the dispositional hearings, the juvenile court granted HCJFS's motion to award legal custody of the children to maternal grandparents. But it awarded liberal unsupervised parenting time with J.S. and F.W. to mother. The juvenile court did not explain the tension in its decision that mother's lack of insight into the domestic violence perpetrated by J.S.'s father placed the children at risk and its decision to leave mother alone with the children for significant periods of time.

### *Analysis*

{¶72} On appeal, mother challenges the juvenile court's decision on a number of grounds. First, she argues, in a general way, that her status as a domestic-violence

25

victim should not penalize her with regard to the custody of her children. Second, she argues that the juvenile court abused its discretion in awarding legal custody to maternal grandparents. I agree with mother on both fronts.

### *Constitutional Issues*

{¶73} In *Nicholson v. Williams*, 203 F.Supp.2d 153 (E.D.N.Y. 2003) ("*Nicholson I*"), the United States District Court for the Eastern District of New York granted an injunction prohibiting child protective services from removing children from their mothers' custody solely because their mothers had been the victims of domestic violence. The injunction questioned the assumption that children in this situation were neglected because their mothers could not protect them from abuse. *Id*. at 163-164. The court's decision also cataloged the testimony of numerous child-welfare experts on the effects that witnessing domestic violence has on children. *Id*. at 197-198. According to the experts, the effects can range from none to serious and can vary in duration. *Id*. At least one well-qualified expert testified that long-term effects of exposure to domestic violence in children are rare. *Id*. The court also cited significant research indicating that separating a child from a parent, particularly at a young age, is likely to lead to lasting effects, including self-blame and separation anxiety disorder. *Id*. at 199-200. Evidence suggests that removal following an episode of domestic violence may actually increase the likelihood a child will experience a negative reaction, because it separates the child from the best support system: the nonviolent parent.[4] *Id*. In addressing this phenomenon, the court further observed

---

[4] Mother did not present evidence to this effect at the dispositional hearings. Doing so, however, would have strengthened her position that relinquishing custody of J.S. and F.W. to a nonparent was not in the children's best interests.

that the child-welfare system in New York rarely removed abusers from the home before seeking to hold victim-parents accountable. *Id.* at 211.

{¶74} Applying these facts to the parties' constitutional claims, *Nicholson* held that decisions to separate children from their parents, even temporarily, raise constitutional due-process concerns. *Id.* at 235-236. The court also acknowledged that parental autonomy is, in constitutional terms, a fundamental liberty interest. *Id.* at 236. And it held that child protective services' removal policy harmed children and mothers by increasing the likelihood that children would suffer the impacts of unnecessary separation and by failing to hold actual abusers accountable. *Id.* at 251-252. In doing so, it commented: "[i]t desecrates fundamental precepts of justice to blame a crime on the victim." *Id.* at 253.

{¶75} Following the issuance of the *Nicholson* injunction, the Second Circuit certified three questions related to the challenged removal policy to the New York Court of Appeals. *See Nicholson v. Scoppetta*, 344 F.3d 154, 176-177 (2d Cir. 2003) ("*Nicholson II*"). Foremost, it queried whether the fact that a mother permitted her children to witness an act of domestic violence could serve as the basis for a neglect finding under New York law, thereby subjecting the children to being removed from her custody. *Id.* In asking that question, the Second Circuit noted that removals based solely upon the fact that a parent-victim of domestic abuse did not prevent a child from seeing the event present "a serious substantive due process question." *Id.* at 174.

{¶76} In response to the Second Circuit's certified questions, the New York Court of Appeals held that merely exposing a child to domestic violence does not constitute "neglect" under New York law. *Nicholson v. Scoppetta*, 3 N.Y.S.3d 357, 370-372 (N.Y. 2004) ("*Nicholson III*"). But where a parent repeatedly allows an abuser into her home and where a caseworker testifies to the "fear and distress" the children

27

experience as a result of their exposure to violence, the standard of "neglect" may be met. *Id.* at 371-372.

{¶77} While specific to New York law, the *Nicholson* case trilogy offers important lessons for Ohio's child-protection regime. Importantly, it suggests that the practice of removing children from mothers who are victims of domestic violence is of dubious constitutional validity. *Nicholson I*, 203 F.Supp.2d at 235-236; *Nicholson II*, 344 F.3d at 174. It also provides factual support that undermines the assumptions upon which the practice rests. For example, children do not fare better when they are separated from a parent-victim. *Nicholson I*, 203 F.Supp.2d at 197-198, 199-200. To the contrary, the potential harms children may experience from witnessing a parent perpetrate domestic violence on another parent are only exacerbated when the children are removed from the home. *Id.* And not all children experience harm after witnessing parent-on-parent domestic violence. *Id.* at 197. For this reason, only those cases where there exists a documented impact on the children at issue rise to the level of actionable "neglect." *Nicholson III*, 3 N.Y.S.3d at 371-372.

{¶78} Thus, the *Nicholson* trilogy supports mother's contention that penalizing her victim status with the loss of custody of her children violates her constitutional rights.

{¶79} Additional policy-based reasons also support a finding of unconstitutionality. For one, the practice of separating children from a parent who experiences domestic violence is likely to discourage victims from reporting their abuse. *Nicholson II*, 344 F.3d at 174; *see* Justine A. Dunlap, *Sometimes I Feel Like A Motherless Child: The Error of Pursuing Battered Mothers for Failure to Protect*, 50 Loy.L.Rev. 565, 585-586 (2004) ("*Motherless Child*"). This places more children and parent-victims at risk, because it increases the likelihood that abusers will evade

28

accountability for their violence. Dunlap at 585-586. For another, the practice is in tension with Ohio's constitutional protections for victims, enshrined in Marsy's Law, which requires that victims be treated with fairness and respect. *See* Ohio Const., art. I, § 10a.

**{¶80}** I therefore agree with mother that the outcome in her case violates her substantive due-process rights and advances dangerous policies that place her and her children at risk. I would grant her relief on this basis.

### *Best-Interest Standards*

**{¶81}** Mother next argues that the trial court abused its discretion in applying the best-interest standard to J.S.'s and F.W.'s dispositions.

**{¶82}** The focus of a dispositional hearing to determine legal custody following the conclusion of temporary custody when a child has been declared dependent is on the best interest of the child. *In re D.H.*, 2021-Ohio-192, ¶ 37 (5th Dist.). There are no specific statutory criteria that apply to this inquiry. Nonetheless, courts have held that the permanent-custody best-interests factors may be useful in assessing legal custody at the dispositional stage. *Id.* These factors are set forth in R.C. 2151.414(D).

**{¶83}** Courts are therefore not required to consider the permanent-custody statutory factors in determining legal custody. *See, e.g., In re A.F.*, 2009-Ohio-333, ¶ 7 (9th Dist.) (describing permanent-custody best-interests factors as merely providing "guidance" in legal-custody proceedings).

**{¶84}** Given the discretionary nature of the R.C. 2151.414(D) factors and mother's unique status as a survivor of domestic violence, the juvenile court's mechanical application of statutory factors not designed or drafted to apply to HCJFS's dispositional motion was unwarranted. As described in *Nicholson I*, removal of children from parents who have survived domestic violence "harm[s] children much

29

more than it protect[s] against harm." *Nicholson I*, 203 F.Supp.2d at 253. Thus, the decision to transfer legal custody to maternal grandparents was against the children's best interests, because it exposed them to the harms of parental separation while lacking any definable benefit in terms of protecting them from domestic violence.

**{¶85}** This conclusion is buttressed by the lack of evidence in the record indicating that J.S.'s father's violence had any direct impact on J.S. and F.W. No witness testified that the children suffered from any particular difficulty as a result of their exposure to the domestic violence perpetrated by J.S.'s father. While there was testimony presented in court that the children require therapeutic services, that testimony did not explain the cause for the children's diagnoses. Based on the findings in the *Nicholson* trilogy, the children's difficulties could be from exposure to J.S.'s father's violence, from the shame and stigma of being separated from their mother, or from something else entirely. The evidence here simply does not say.

**{¶86}** Thus, under a general best-interest inquiry, I would hold that the juvenile court abused its discretion in awarding legal custody to maternal grandparents, because there was no particularized evidence suggesting the children suffered harm from exposure to J.S.'s father's acts of domestic violence and because removing them from their mother poses a greater risk of harm than keeping them in her care. *Nicholson I*, 203 F.Supp.2d at 253.

**{¶87}** But even if the R.C. 2151.414(D) best-interest factors apply, I also believe the juvenile court abused its discretion in applying those standards to J.S. and F.W. In particular, I take issue with the juvenile court's finding under R.C. 2151.414(D)(1)(d) that mother could not provide a legally secure placement for her children. A legally secure placement means a safe, stable, consistent environment where a child's needs will be met. *In re R.R.*, 2023-Ohio-2575, ¶ 35 (6th Dist.).

**{¶88}** Contrary to the juvenile court's findings, when I read the record of J.S.'s and F.W.'s dispositions, I read about a mother who is strong, resilient, insightful, forgiving, and committed to healing for herself and her children. I read about a mother who is intimately aware of how close she came to dying at the hands of a violent man, so much so that she cries, shakes, and needs to take breaks when forced to confront that reality. I read a story of forgiveness and closure following a mother's horrific near-death experience. I read about a mother who has done all that anyone could ask of her to overcome that situation, going on to hold successful employment, establish a safe household, plan for the future, and invest in her children's daily lives. I read about a system that placed accountability in the wrong place, punishing a mother for the violent actions of a father while taking no action itself to protect the children from him. And I read about two children who are missing out on a life they could have with a mom who would do anything to protect them, just as she bravely saved her own life that fateful evening in December of 2021.

**{¶89}** Nothing about this says that mother cannot provide a legally secure home for her children. To the contrary, mother stands ready to financially, emotionally, and logistically care for J.S. and F.W.

**{¶90}** For these reasons, I would sustain mother's assignment of error, reverse the juvenile court's judgment, and return her children to her custody and care.

Please note:

The court has recorded its own entry this date.

31